**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**(WESTERN DIVISION)**

| | |
|---|---|
| MERRY F. SHANE, Individually And On Behalf Of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> AMCORE FINANCIAL, INC., JOHN A. HALBROOK, FREDERICK D. HAY, STEVEN S. ROGERS, JOHN W. GLEESON, WILLIAM R. MCMANAMAN, JACK D. WARD, PAULA A. BAUER, PAUL DONOVAN, TERESA IGLESIAS-SOLOMON, JUDITH CARRÉ SUTFIN, DAVID H. WILSON, and JOHN DOES 1-20, <br><br> Defendants. | Civil Action:   $10 \, CV \, 50089$ <br><br><br> **JURY DEMANDED** |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE**
**EMPLOYEE RETIREMENT INCOME SECURITY ACT**

Plaintiff, on behalf of the Amcore Financial Security Plan (the "Plan"), covering substantially all employees of Amcore Financial, Inc. and its subsidiaries (collectively "Amcore" or the "Company"), individually and on behalf of all others similarly situated (the "Participants"), alleges as follows:

**INTROUCTION**

1.      Plaintiff brings this action on behalf of the Plan and all Participants and beneficiaries in the Plan to recover losses to the Plan for which the fiduciaries of the Plan are liable pursuant to Sections 409 and 502(a)(2) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109 and 1132(a)(2).  In addition, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, equitable tracing, and other monetary relief.

2.     From May 10, 2005 through present (the "Class Period"), the Plan acquired and held shares of Amcore common stock ("Amcore Stock" or "Company Stock"), which was offered as one of the retirement saving options in the participant contribution component of the Plan.

3.     Defendants, each having certain responsibilities regarding the management and investment of Plan's assets, breached their fiduciary duties to the Plan and Participants by failing to prudently and loyally manage the Plan's investment in Company Stock by, among other things: (i) continuing to offer Company Stock as a retirement saving option; (ii) continuing to acquire and hold shares of Company Stock in the Plan when it was imprudent to do so; (iii) failing to provide complete and accurate information to Participants regarding the Company's financial condition and the prudence of investing in Company Stock; and (iv) maintaining the Plan's pre-existing investment in Company Stock when it was no longer a prudent investment for the Plan.

4.     As a result of Defendants' fiduciary breaches, as alleged herein, the Plan suffered substantial losses, resulting in the depletion of millions of dollars of the retirement savings and anticipated retirement income of the Plan's Participants. Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

5.     Because Plaintiff's claims apply to the Participants as a whole, and because ERISA authorizes Participants such as Plaintiff to sue for plan-wide relief for breach of fiduciary duty, Plaintiff brings this as a class action on behalf of all Participants of the Plan during the Class Period. Plaintiff also brings this action as a participant seeking plan-wide relief for breach of fiduciary duties on behalf of the Plan.

6.     In addition, because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief. At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, amend the Complaint or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

## JURISDICTION AND VENUE

7.     ***Subject Matter Jurisdiction.*** This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

8.     ***Personal Jurisdiction.*** ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of Defendants are residents of the United States, and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in this District.

9.     ***Venue.*** Venue is proper in this District pursuant to § 27 of the 1934 Act. Amcore's corporate headquarters is located at 501 Seventh Street in Rockford, Illinois.

## PARTIES

### Plaintiff

10.     *Plaintiff Merry F. Shane* ("Shane") is a former Amcore employee and is a participant in the Plan.

### Defendants

#### A.     The Company

11.     *Defendant Amcore* is a registered bank holding company incorporated under the laws of the State of Nevada in 1982.  The Company's corporate headquarters is located at 501 Seventh Street in Rockford, Illinois.  The operations are divided into three business segments: (i) Commercial Banking; (ii) Consumer Banking; and (iii) Investment Management and Trust.

#### B.     Director Defendants

12.     *Defendant John A. Halbrook* ("Halbrook") was, at all relevant times, a Director of the Company.  Defendant Halbrook is also a member of the Company's Audit Committee. During the Class Period, Defendant Halbrook was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

13.     *Defendant Frederick D. Hay* ("Hay") was, at all relevant times, a Director of the Company.  During the Class Period, Defendant Hay was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he

exercised authority or control with respect to the management of the Plan's assets.

14. ***Defendant Steven S. Rogers*** ("Rogers") was, at all relevant times, a Director of the Company. Defendant Rogers is also a member of the Company's Audit Committee. During the Class Period, Defendant Rogers was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets..

15. ***Defendant John W. Gleeson*** ("Gleeson") was, at all relevant times, a Director of the Company. Defendant Gleeson is also a member of the Company's Audit Committee. During the Class Period, Defendant Gleeson was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

16. ***Defendant William R. McManaman*** ("McManaman") was, at all relevant times, Chairman of the Board of Directors, Chief Executive Officer, Member of Executive Committee and Chairman of AMCORE Bank NA. Defendant McManaman was also a member of the Company's Audit Committee until February 2008. During the Class Period, Defendant MacManaman was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect

to the management of the Plan's assets.

17.     **Defendant Jack D. Ward** ("Ward") was, at all relevant times, a Director of the Company.  During the Class Period, Defendant Ward was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

18.     **Defendant Paula A. Bauer** ("Bauer") was, at all relevant times, a Director of the Company.  Defendant Bauer is also a member of the Company's Audit Committee.  During the Class Period, Defendant Bauer was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

19.     **Defendant Paul Donovan** ("Donovan") was, at all relevant times, a Director of the Company.  During the Class Period, Defendant Donovan was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

20.     **Defendant Teresa Iglesias-Solomon** ("Iglesias-Solomon") was, at all relevant times, a Director of the Company.  During the Class Period, Defendant Iglesias-Solomon was a fiduciary within the meaning of ERISA, because she exercised discretionary authority or

discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or control with respect to the management of the Plan's assets.

21.    Defendants Halbrook, Hay, Rogers, Gleeson, McManaman, Ward, Bauer, Donovan, and Iglesias-Solomon are herein referred to as the "Director Defendants."

### C.    Other Defendants

22.    **Defendant Judith Carré Sutfin** ("Sutfin") was, during part of the Class Period, Chief Financial Officer, Principal Accounting Officer, and Executive VP of AMCORE Bank N.A.  Defendant Sutfin also signed the Company's Form 11-Ks, dated June 30, 2008 and June 16, 2009 as Plan Administrator.  During the Class Period, Defendant Sutfin was a fiduciary within the meaning of ERISA, because she exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or control with respect to the management of the Plan's assets.

23.    **Defendant David H. Wilson** ("Wilson") was, during part of the Class Period, the Executive Vice President and Chief Financial Officer ("CFO") of the Company.  Defendant Wilson also signed the Company's Form 11-Ks, dated June 26, 2006, July 13, 2007 and July 16, 2007 as Plan Administrator.  During the Class Period, Defendant Wilson was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of

the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

24.     ***Defendants John Does 1-20*** were persons who exercised day-to-day responsibility for the management and administration of the Plan and its assets. John Does 1-20 failed to properly appoint, monitor and inform such persons in that these Defendants failed to adequately inform such persons about the true financial and operating condition of the Company or, alternatively, these Defendants did adequately inform such persons of the true financial and operating condition of the Company (including the financial and operating problems being experienced by Amcore during the Class Period identified herein) but nonetheless continued to allow such persons to offer Amcore Stock as investment options under the Plan when the market prices of Amcore Stock was artificially inflated and when Amcore Stock was not prudent investments for Participants' retirement accounts under the Plan. Liability is only asserted against each of these Defendants for such periods of time as these Defendants acted as a fiduciary with respect to the Plan.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following class of persons similarly situated (the "Class"):

> All persons who were Participants in or beneficiaries of the Plan at any time between May 10, 2005 and the present, inclusive (the "Class Period) and whose accounts held Company Stock or units in the Amcore Stock Fund, but excluding all named defendants and their heirs or successors in interest.

26.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, the Forms 5500 Annual

Return/Report of Employee Benefit Plan for calendar plan year 2007 and 2008 state that the Plan held $25,114,511 and $16,107,486 of Company securities, respectively.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants each owed a fiduciary duties to Plaintiff and members of the Class;

(b)     whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's Participants and beneficiaries; and

(i)     whether Defendants violated ERISA.

28.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained a diminution of vested benefits arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

29.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, ERISA, and complex civil and commercial litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

30.     Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members or the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical manner, be dispositive of the interests of the other members of the Class parties to the actions, or substantially impair or impede their ability to protect their interests.

31.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecuting separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

32.    In the alternative, Plaintiff requests that the Court allow them to proceed under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2). Section 502(a)(2), 29 U.S.C. § 1132(a)(2) states that "[a] civil action may be brought -- " "by the Secretary [of Labor], or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title[.]" ERISA Section 409(a), 29 U.S.C. § 1109(a), sets forth that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable *to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary*, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

(Emphasis added).

## THE PLAN

33.    The Plan is an "employee pension benefit plan" as defined by §§ 3(3) and (3)(2)(A) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(2)(A).

34.    The Plan is a legal entity that can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).

35.     In this action for breach of fiduciary duty, the Plan is neither a plaintiff nor a defendant. Rather, Plaintiff requests relief for the benefit of the Plan and for the benefit of its Participants.

36.     The Plan is "defined contribution plan" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to the Participants' account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participants' accounts. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

37.     The Plan is a voluntary contribution plan whereby Participants make contributions to the Plan and direct the Plan to purchase investments with those contributions from options pre-selected by Defendants which are then allocated to Participants' individual accounts.

38.     The Plan Participants may invest their contributions and employer contributions in one or more of the investment options offered by the Plan. Investment income, representing interest and dividends, and changes in the fair value of investments, are credited to each participant on a daily basis based upon individual investment options selected.

39.     The Plan's 2008 Form 11-K states in relevant part:

> Each year, participants may contribute up to 100% of their annual wages on a pretax basis, not to exceed $15,500 in 2008 and $15,500 in 2007. If the participant was age 50 or older, the participant was entitled to contribute an additional "catch-up contribution" of up to $5,000 per year in 2008 and 2007. AFI makes safe harbor matching contributions of 100% of the first 3% of employee compensation contributed to the Plan and 50% of the next 2% of compensation contributed to the Plan. *Employer matching contributions are invested in AFI common stock*; however, participants are allowed to sell any portion of their AFI common stock within the Plan and direct the proceeds to another investment choice within the Plan.

The employer contributes 3% of the participants' annual wages each year to a basic retirement account; these funds are for retirement and, therefore, are not available for participant loans. These funds are allocated to investments in the same manner as the participants' contributions. The Company suspended the basic retirement contribution effective April 1, 2009.

The Plan allows for Roth deferral contributions subject to the same contribution limitations as stated above. Roth deferrals allow a participant's contributions be included in the participant's annual income for the taxable year of the contribution. At time of qualified distribution, the deferrals and earnings are excluded from income. A participant's Roth deferred contributions will be separately accounted for, as will gains and losses attributable to those Roth deferred contributions, in a Roth deferred contributions account.

Effective beginning February 1, 2008, the Plan was amended to allow for automatic enrollment. For salary deferral contributions, an Employee will become a Participant on the first day of the month coincident with or immediately following completion of ninety (90) days of service. An Employee shall be deemed to have completed a salary reduction agreement electing salary deferrals at the rate of 3% of compensation upon entering the Plan. An Employee may elect not to participate in salary deferrals or to change the rate of salary deferrals at any time by election in accordance with rules governing modifications.

(Emphasis added).

40.     The Company made matching contributions in Company Stock. *See* Form 11-K, dated June 29, 2009.

## A.     The Plan Fiduciaries

41.     ***Named Fiduciaries***. ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

42.     ***De Facto Fiduciaries***. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary

authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

43.    Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its Participants under ERISA in the manner and to the extent set forth in the governing the Plan documents, through their conduct, and under ERISA.

44.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan and the Plan's investments solely in the interest of the Plan's Participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

45.    Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

## FACTUAL BASIS OF THE FIDUCIARY BREACHES

46.    On May 10, 2005, the Company filed its 2005 first quarter Form 10-Q with the Securities and Exchange Commission ("SEC"). This fiduciary communication stated that the Company had undergone an examination by the Office of the Comptroller of the Currency

("OCC") and (i) had been furnished a draft of a the OCC's Report of Examination ("ROE") and a (ii) supervisory agreement pursuant to which the Company agreed to comply with the OCC's rules and regulations. The fiduciary communication stated that: "The Bank has already begun to implement procedures addressing the matters identified by the OCC."

47. The May 10, 2005 fiduciary communication was materially inaccurate because it represented to Plan Participants that the Company was curing the control deficiencies that were identified by the OCC when, in fact, it was not. As noted in paragraphs 52 through 54 below, during August 2006, the OCC ordered the Company to cure its control deficiencies because it did not do so as it had agreed.

48. On May 31, 2005, the Company filed a Form 8-K with the SEC, which disclosed its execution of an agreement with the OCC. The agreement, which was appended to this fiduciary communication, provided that the Company was required to:

(a)    "adopt, implement, and thereafter ensure adherence to a written Consumer Compliance Program designed to ensure that the Bank is operating in compliance with all applicable consumer protection laws, rules and regulations."

(b)    "appoint or employ a capable person to serve as Compliance Officer who shall be vested with sufficient authority to monitor and ensure the Bank's compliance with its Consumer Compliance Program, and all applicable consumer compliance laws and regulations."

(c)    "immediately take all necessary steps to ensure that Bank management corrects each violation of law, rule or regulation cited in the ROE [Report Of Examination] and in any subsequent Report of Examination. The Board shall provide quarterly progress reports to the Assistant Deputy Comptroller detailing the date and

manner in which each correction has been effected during that reporting period."

(d) "adopt, implement, and thereafter ensure Bank adherence to specific procedures to prevent future violations as cited in the ROE and shall adopt, implement, and ensure Bank adherence to general procedures addressing compliance management which incorporate internal control systems and education of employees regarding laws, rules and regulations applicable to their areas of responsibility."

49. On August 9, 2005, the Company filed its 2005 second quarter Form 10-Q with the SEC. This fiduciary communication also represented that "[t]he BANK has already begun to implement procedures addressing the matters identified by the OCC and expects to complete all committed changes within the timeframes defined in the agreement."

50. The August 9, 2005 fiduciary communication was materially inaccurate for the reason set forth in paragraph 47 above.

51. On November 9, 2005, March 15, 2006, and May 10, 2006, the Company disseminated fiduciary communications which reiterated the May 2005 and August 2005 representations. These fiduciary communications were materially inaccurate for the reason set forth in paragraph 47 above.

52. On August 9, 2006, the Company filed its 2006 second quarter Form 10-Q with the SEC. This fiduciary communication disclosed that the Company had not implemented procedures to address the matters identified by the OCC and, therefore, was compelled to enter into a Consent Order with the OCC. According to this fiduciary communication: "This order will primarily impose requirements on the Bank to take certain actions to strengthen its compliance monitoring policies, procedures, training and overall program relating to the Bank Secrecy Act/Anti-Money Laundering (BSA/AML) regulations."

53.    On August 10, 2006, the Company filed a Form 8-K with the SEC which disclosed its execution of Stipulation and Consent to the Issuance of a Consent Order (the "Order") with the OCC.  This fiduciary disclosed that the Order required the Company to:

(a)    appoint a Compliance Committee of at least three directors who would be responsible for monitoring and coordinating the Bank's adherence to the provisions of this Order.

(b)    develop, implement, and thereafter ensure Bank adherence to a written program of policies and procedures to provide for compliance with Bank Secrecy Act ("BSA") including:

- written criteria for identification of transactions that pose greater than normal risk for compliance with the BSA.

- formal evaluation of the knowledge of the Bank's operational and supervisory personnel of the Bank's policies and procedures for identifying transactions that pose greater than normal risk for compliance with the Bank Secrecy Act.

- enhanced policies and procedures for identifying and monitoring transactions that pose greater than normal risk for compliance with the Bank Secrecy Act.

- enhanced policies and procedures for recording, maintaining, and recalling information about transactions that pose greater than normal risk for compliance with the Bank Secrecy Act.

- well-defined policies and procedures for investigating and resolving the Bank's response to transactions that have been identified as posing greater than normal risk for compliance with the Bank Secrecy Act.

- adequate controls and procedures to ensure that all suspicious and

large currency transactions are identified and reported.

- procedures to identify and report to appropriate management personnel and/or committee:

    (i)    frequent or large volume cash deposits or wire transfers or book entry transfers to or from offshore or domestic entities or individuals.

    (ii)    wire transfers or book entry transfers that are deposited into several accounts.

    (iii)    receipt and disbursement of wire transfers or book entry transfers without an apparent bona fide business reason.

    (iv)    receipt and disbursement of wire transfers or book entry transfers that are suspicious or inconsistent with the customers' business receipt and disbursement of currency or monetary

    (v)    instruments that are suspicious or inconsistent with the customers' business; and

    (vi)    if applicable, accounts opened in the name of or for the benefit of a financial institution or foreign bank, as defined in 31 C.F.R. Section 103.11.

- a method for introducing new products and services that ensures that the policies and procedures governing new products and services are consistent with the Bank's program for compliance with the Bank Secrecy Act.

- develop, implement, and ensure Bank adherence to a written

program of policies and procedures to provide for the Bank's monitoring of suspicious cash, monetary instruments, wire transfers, and other activities for all types of transactions, accounts, customers, products, services, and geographic areas.

- develop, implement, and thereafter ensure Bank adherence to a written program of policies and procedures to provide for the application of appropriate thresholds for monitoring all types of transactions, accounts, customers, products, services, and geographic areas that pose greater than normal risk for compliance with the Bank Secrecy Act.

- develop, implement, and thereafter ensure Bank adherence to expanded account-opening procedures for all accounts, including non-cash areas, that pose greater than normal risk for compliance with the Bank Secrecy Act by requiring, among other things:

  (i)   identification of all account owners and beneficial owners in compliance with 31 C.F.R. Section 103.121.

  (ii)  identification of the officers, directors, major shareholders or partners, as applicable.

  (iii) documentation of customers' relevant financial information, the type of business conducted by the customer, and the customer's source of income or wealth.

- develop, implement, and thereafter ensure Bank maintenance of an integrated, accurate system for all Bank areas to produce periodic reports designed to identify unusual or suspicious activity, including patterns of activity, to monitor and evaluate unusual or suspicious activity, and to maintain accurate information needed to

produce these reports.

54.    The Order further required the Company to adopt, implement, and thereafter ensure Bank adherence to an independent, internal audit program, including its scope, testing, and documentation, sufficient to:

(a)    detect irregularities in the Bank's operations;

(b)    determine the Bank's level of compliance with all applicable laws, rules and regulations;

(c)    evaluate the Bank's adherence to established policies and procedures;

(d)    perform an appropriate level of testing to support the audit findings;

(e)    ensure adequate audit coverage in all areas; and

(f)    establish an annual audit plan using a risk based approach sufficient to achieve these objectives.

55.    On November 9, 2006, March 15, 2007, May 10, 2007, August 9, 2007, November 9, 2007, the Company disseminated fiduciary communication which disclosed the regulatory actions described above, and strongly implied that the Company was taking all curative actions ordered by the OCC.    These fiduciary communications were materially inaccurate because the Company was not taking all curative actions ordered by the OCC.

56.    On March 17, 2008, the Company filed its 2007 Form 10-K with the SEC. This fiduciary communication contained a disclosure which stated that the Company's curative actions were "currently under review by the OCC" and that:

> On March 11, 2008, the OCC notified the Bank of its intent to enter into a written agreement to formalize the Bank's commitment to address weaknesses in the Bank's commercial lending area identified by the OCC in examinations during 2007. The terms of such agreement will likely include requirements for the Bank to improve credit underwriting and administration practices, among other things.

57.     On April 17, 2008, the Company filed a Form 8-K with the SEC. This fiduciary communication stated:

> As previously disclosed, on March 11, 2008, the OCC notified the Bank of its intent to enter into a written agreement to formalize the Bank's commitment to address weaknesses in the Bank's commercial lending area identified by the OCC in examinations during 2007. The terms of such agreement will include requirements for the Bank to improve credit underwriting and administration practices, among other things. This agreement has not yet been executed between the OCC and the Bank.

58.     The April 17, 2008 Form 8-K contained an appended April 17, 2008 press release which disclosed "a net loss for the first quarter 2008 of $27.5 million, a decrease from net income of $8.2 million in the prior-year period and $7.5 million in the previous quarter. The loss per diluted share for first quarter 2008 was $1.25, a decrease from earnings of $0.35 per diluted share in first quarter 2007, and $0.34 in the previous quarter." The reported results of operations was materially impacted by a $57.2 million provision for loan losses; a provision which was $54.1 higher than the $3.2 million reported in the first quarter 2007 and $50.8 million higher than the $6.4 million reported in the fourth quarter 2007.

59.     This press release quoted Defendant McManaman as stating:

> AMCORE, like most banks with a commercial real estate concentration, experienced rapidly growing non-performing loans in the first quarter. The weakness related primarily to builders and developers, as well as broader commercial real estate.
>
> We clearly recognize this is a very difficult environment for banks. Consequently, *we have begun a process of evaluating our disciplines around our lending practices and have already implemented many improvements.* We intend to further this process with the advice of independent advisors in order to establish a more disciplined execution environment and to respond to the recommendations of bank regulators. This process has commenced and will be completed before year-end.

(Emphasis added).

60.     The April 17, 2008 fiduciary communications were materially inaccurate because

- 20 -

they represented to Plan Participants that the Company was curing the control deficiencies that were identified by the OCC when, in fact, it was not.

61.    Defendant McManaman's April 17, 2008 statement was materially inaccurate because the Company had not, in fact, "already implemented many improvements" to the Company's disciplines around its lending practices.

62.    On May 7, 2008, the Company filed a Form 8-K with the SEC.  This fiduciary communication quoted Defendant McManaman as stating:

> AMCORE has a solid senior management team in place.  I trust that my background and experience as a longtime Board member will continue to complement this team as we implement strategies to improve our performance and create greater efficiencies.  We have a strong foundation here and I believe in our future and the dedication of the people who work here.

63.    Defendant McManaman's May 7, 2008 statement was materially inaccurate because the Company did not have a strong foundation, but was plagued by the many control deficiencies specified above.

64.    On May 16, 2008, the Company filed a Form 8-K with the SEC.  This fiduciary communication contained a copy of the agreement with the OCC which was referred to in the April 17, 2008 fiduciary communication, as discussed above.  The agreement provided, among other things, that the Company was required to:

(a)    engage an external and independent person(s) or firm (the "External Reviewer") with qualifications to assess complex lending transactions, to conduct a thorough review of the bank's Real Estate (RE) and Commercial and Industrial (CI) loans.  According to the agreement: "At a minimum, the External Reviewer shall prepare a report ("the Report") setting forth its detailed findings and conclusions about the quality of these loans, the levels of classified and criticized assets, and the accuracy of internally

assigned loan risk grades. The Report shall identify the loans reviewed and address any differences between the Bank's and the External Reviewer's risk ratings, and the Bank's compliance with legal and regulatory requirements and the Bank's loan policies."

(b)   establish and implement an effective ongoing loan review system for the Bank's loan portfolios. According to the agreement, the loan review system was required to be independent from the lending function, and was to provide loan review personnel sufficient authority to perform their duties, and be staffed with sufficient and skilled personnel to ensure the timely and effective review of the Bank's loan portfolios. The agreement stated that "the system shall provide for written reports to be filed with the Board at least quarterly. The first such report must be filed within 30 days of June 30, 2008. Such reports shall include, at a minimum, conclusions and support regarding:

- compliance with the programs established by this agreement;

- the identification, type, rating, and amount of problem loans;

- the identification and amount of delinquent loans on non-accrual status;

- the level of credit and collateral documentation exceptions;

- the identification and status of violations of laws, rules and regulations pertaining to the Bank's lending function;

- the identification and analysis of concentrations of credit, significant economic factors, and general conditions and their impact on the credit quality of the Bank's loan portfolios;

- the accuracy of the loan officer risk ratings including a listing of loans downgraded by internal or external loan review personnel; and

- compliance with the Bank's lending policies detailing the number and volume of loans funded with exceptions or otherwise not in conformance with the Bank's lending policies.

(c)     take action to protect its interest in those assets criticized in the December 31, 2007 Report of Examination, in any subsequent Report of Examination, by internal or external loan review, or in any list provided to management by the National Bank Examiners during any examination.

(d)     adopt and implement a written program designed to eliminate the basis of criticism of assets criticized in the ROE, in any subsequent Report of Examination, or by any internal or external loan review, or in any list provided to management by the National Bank Examiners during any examination as "doubtful," "substandard," or "special mention." According to the agreement, the program was required to include, at a minimum:

- an identification and timing of the expected sources of repayment;

- documentation of the current fair value of supporting collateral, and the position of the Bank's lien on such collateral where applicable;

- an analysis of current and satisfactory credit information, including cash flow analysis where loans are to be repaid from operations; and

- the proposed specific actions the bank is taking to eliminate the basis of criticism and the time frame for its accomplishment.

(e)     furnish to the OCC, a copy of the program for all criticized assets equal to or exceeding five hundred thousand dollars ($500,000).

(f)     conduct a review, on at least a quarterly basis, to determine the status and

effectiveness of the written programs.

(g) develop and implement a written program to improve the Bank's loan portfolio management and to implement the applicable specific actions outlined in the Matters Requiring Board Attention of the December 31, 2007 Report of Examination and any subsequent Report of Examination. According to the agreement, such program was required to include, among other things, procedures and sufficient to ensure:

- compliance and conformance with the Bank's lending policies and laws, rules, and regulations pertaining to the Bank's lending function,

- the use of a performance appraisal process for lenders that, at a minimum, includes performance appraisals, job descriptions, and compensation/incentive programs which adequately considers performance relative to policy compliance, documentation standards, accuracy in credit grading, and other loan administration matters.

- effective stress testing of individual commercial real estate (CRE) loans and the CRE portfolio.

(h) revise the Bank's written loan policy to implement the specific actions needed to improve the lending policy outlined in the Matters Requiring Board Attention of the December 31, 2007 Report of Examination and any subsequent Report of Examination. According to the agreement, the revisions were required to address:

- construction inspections and status reports.

- loan covenants.

- interest reserves.

- curtailment requirements for home construction loans.

(i)     establish Management Information System ("MIS") reports to implement the specific actions needed to improve the loan portfolio monitoring process outlined in the Matters Requiring Board Attention of the December 31, 2007 Report of Examination and any subsequent Report of Examination, and to ensure compliance with relevant regulatory guidance.

(j)     revise the Company's real estate appraisal policy and processes to implement relevant regulatory guidance and the specific actions needed to improve the appraisal function outlined in the Matters Requiring Board Attention of the December 31, 2007 Report of Examination and any subsequent Report of Examination.

(k)     "immediately take all necessary steps to ensure that Bank management corrects each violation of law, rule or regulation cited in the December 31, 2007 Report of Examination and in any subsequent Report of Examination."

(l)     "adopt, implement, and thereafter ensure Bank adherence to specific procedures to prevent repeated future violations and shall adopt, implement, and ensure Bank adherence to general procedures addressing compliance management which incorporate internal control systems and education of employees regarding laws, rules and regulations applicable to their areas of responsibility."

(m)     strengthen the company's methodology for assessing the adequacy of the Allowance for Loan and Lease Losses by adopting and implementing written policies and procedures for maintaining an adequate ALLL in accordance with generally accepted accounting principles. According to the agreement, the methodology was required to include procedures:

- detailing the process for identifying loans considered impaired how

the amount of impairment for those loans will be measured, consistent with FASB Statement of Financial Accounting Standards Number 114, Accounting by Creditors for Impairment of a Loan;

- for segmenting the loan portfolio and estimating loss on groups of loans, consistent with FASB Statement of Financial Accounting Standards Number 5, Accounting for Contingencies; and

- for validating the ALLL methodology.

- that address specific actions needed to improve the methodology outlined in the Matters Requiring Board Attention on page 7 of the December 31, 2007 Report of Examination and in any subsequent Report of Examination.

- that provide for a review and approval of the Allowance by the Board at least once each calendar quarter, with any deficiency in the Allowance shall be remedied in the quarter it is discovered, prior to the filing of the Consolidated Reports of Condition and Income, by additional provisions from earnings.

(n) ensure that the Company's compliance function is adequately staffed with capable personnel possessing sufficient authority to administer the Bank's consumer compliance and Bank Secrecy Act programs.

65. On August 11, 2008, the Company filed its 2008 second quarter Form 10-Q with the SEC. This fiduciary communication noted that the Company's provision for loan losses had increased by $35.8 million to $40.0 million in second quarter 2008 from $4.2 million in second quarter of 2007, reflecting a 356% increase in non-performing loans. It also stated: "[t]he Bank has already begun to implement enhancements to its credit processes to address the matters identified by the OCC and the Bank expects to comply with all the requirements specified in the

Agreement."

66.     On November 7, 2008, the Company filed its 2008 third quarter Form 10-Q with

the SEC. This fiduciary communication noted that the Company's provision for loan losses had

increased $32.7 million to $48.0 million in third quarter of 2008 from $15.3 million in third

quarter of 2007, reflecting a 365% increase in non-performing loans year-over-year. It also

stated:

> On May 15, 2008, the Bank entered into a written agreement (the
> "Agreement") with the OCC. The Agreement describes
> commitments made by the Bank to address and strengthen banking
> practices relating to asset quality and the overall administration of
> the credit function at the Bank. The Bank has implemented
> enhancements to its credit processes to address the matters
> identified by the OCC and expects to comply with all the
> requirements specified in the Agreement.

67.     The August 11, 2008 and November 7, 2008 fiduciary communications were

materially inaccurate because the Company had not implemented enhancements to its credit

processes to address the matters identified by the OCC and was unable to comply with all the

requirements specified in the Agreement.

68.     On March 16, 2009, the Company filed its 2008 Form 10-K with the SEC. This

fiduciary communication noted that the Company's provision for loan losses had increased by

$173.6 million to $202.7 million in 2008 from $29.1 million in 2007, reflecting $99.6 million in

net charge-offs and a $242.3 million increase in non-performing loans for 2008. It also

contained a disclosure which stated that the Company "has implemented enhancements to its

credit processes to address the matters identified by the OCC and continues its efforts to comply

with all the requirements specified in the Agreement."

69.     The March 16, 2009 fiduciary communication was materially inaccurate for the

reasons specified in paragraph 67 above.

70.     On June 26, 2009, the Company filed a Form 8-K with the SEC. This fiduciary

communication disclosed that the Company executed an agreement with the Federal Reserve Bank of Chicago (the "FRB") that:

      (a)    restricted the payment of dividends by the Company, as well as the taking of dividends or any other payment representing a reduction in capital from the Company's wholly owned subsidiary, AMCORE Bank, National Association (the "Bank"), without the prior approval of the FRB.

      (b)    the Company not incur, increase, or guarantee any debt, repurchase or redeem any shares of its stock, or pay any interest or principal on subordinated debt or trust preferred securities, in each case without the prior approval of the FRB.

      (c)    required the Company to develop a capital plan for the Company within 60 days, which plan was required to address, among other things, the Company's current and future capital requirements, including compliance with minimum capital ratios, adequacy of capital, the source and timing of additional funds, and procedures to notify the FRB no more than 30 days after the end of any quarter in which the Company's consolidated capital ratios or the Bank's capital ratios (total risk-based, Tier 1, or leverage) fall below the required minimums.

71.    The June 26, 2009 fiduciary communication disclosed that on June 25, 2009, pursuant to a Stipulation and Consent to the Issuance of a Consent Order, the Company consented and agreed to the issuance of a Consent Order (the "Order") by the OCC which required the Company to, among other things:

      (a)    achieve and maintain, by September 30, 2009, Tier 1 capital at least equal to 8% of adjusted total assets, Tier 1 risk-based capital at least equal to 9% of risk-weighted assets and total risk-based capital at least equal to 12% of risk-weighted assets.

(b)     develop, within 30 days, a capital plan for the Bank, which, among other things, was required to include specific plans for maintaining adequate capital, a discussion of the sources and timing of additional capital, as well as contingency plans for alternative sources of capital.

(c)     develop, within 60 days, a liquidity risk management program to assess, on an ongoing basis, the Company's current and projected funding needs, and ensure that sufficient funds exist to meet those needs.

72.     The foregoing constituted an event of default under the Credit Agreement, dated as of August 8, 2007 and amended as of October 10, 2008 and March 3, 2009, between the Company and JPMorgan Chase Bank, N.A. ("JPMorgan").

73.     On November 9, 2009, the Company filed its 2009 third quarter Form 10-Q with the SEC. This fiduciary communication disclosed that:

> By letter dated November 4, 2009 (the "Letter"), the OCC notified the Bank of its finding that the Capital Plan is "not acceptable", stating that the OCC is unable to determine that the Capital Plan "is likely to succeed in restoring the Bank's capital at this time." The OCC further advised the Bank that it was being treated as "significantly undercapitalized" within the meaning of the prompt corrective action (the "PCA") provisions of the Federal Deposit Insurance Act and implementing OCC regulations. As a result of this regulatory determination, the Bank thereupon became subject to the PCA activity and operational restrictions applicable to "significantly undercapitalized" depository institutions, including, among other things, the mandatory requirement that the Bank submit an acceptable Capital Restoration Plan ("CRP"), as required under the PCA guidelines, no later than December 4, 2009. The Letter also indicated that the OCC is requiring the Bank to prepare and submit to the OCC a plan for the sale or merger of the Bank (a "Disposition Plan") by December 4, 2009, as specified under the Consent Order. The Bank may develop one plan to satisfy both the requirements of a CRP and a Disposition Plan required pursuant to the Letter, provided the plan meets the requirements of both. In consultation with its professional advisors, the Bank intends to resubmit a CRP and a Disposition Plan by the required date.
>
> On November 6, 2009, the FRB notified the Company in writing that the Company's capital plan submitted under the terms of the

FRB Agreement was unacceptable in addressing the capital erosion of the Company and the Bank. The FRB concluded that, based on the information provided by the Company, as well as the Company's current negative financial trends, the Company's capital plan was not viable. Further, the Bank was unable to meet the regulatory capital maintenance requirements of the Consent Order by the required September 30, 2009 date. As a result of the OCC Agreement, as well as the FRB Agreement, the Consent Order and the Letter, the Company is ineligible for certain actions and expedited approvals without the prior written consent and approval of the applicable regulatory agency. These actions include, among other things, the appointment of directors and senior executives, making or agreeing to make certain payments to executives or directors, business combinations and branching.

The Company and the Bank are diligently continuing to work with their financial and professional advisors in seeking qualified sources of outside capital, and in achieving compliance with the requirements of the Consent Order, the FRB Agreement and the Letter. The Company and the Bank continue to consult with the OCC, FRB and FDIC on a regular basis concerning the Company's and Bank's proposals to obtain outside capital and to develop action plans that will be acceptable to federal regulatory authorities, but there can be no assurance that these actions will be successful, or that even if one or more of the Company's and Bank's proposals are accepted by the Company's and Bank's Federal regulators, that these proposals will be successfully implemented.

74.    On March 22, 2010, the Company filed its 2009 Form 10-K with the SEC. Updating the disclosure contained in the 2009 third quarter Form 10-Q, the fiduciary communication stated that:

In consultation with its professional advisors, the Bank resubmitted a combined CRP and Disposition Plan by the required December 4, 2009 due date. By return letter dated January 8, 2010 (the "Response Letter"), the OCC notified the Bank that its CRP was not acceptable. According to the OCC, the CRP was not accepted because, among other things, it did not meet the statutory requirements that the CRP be based on "realistic assumptions" and be likely to succeed in restoring the Bank's capital. In addition, on January 12, 2010, the FRB notified the Company that the Company's capital plan previously submitted to the FRB continued to be unacceptable in addressing the capital erosion of the Company and the Bank. The Response Letter provided that even if the Bank's capital ratios improve to the undercapitalized category, the Bank would continue to be subject to operational restrictions applicable to significantly undercapitalized institutions until such time as the Bank has submitted to the OCC an acceptable CRP. The OCC also stated its view that the recently announced asset

sales by the Bank have increased the overall risk to the Bank's capital base.

The Company and the Bank continue to diligently work with their financial and professional advisors in seeking qualified sources of outside capital, and in achieving compliance with the requirements of the Consent Order, the FRB Agreement, the Letter and the Response Letter. The Company and the Bank continue to consult with the OCC, FRB and FDIC on a regular basis concerning the Company's and Bank's proposals to obtain outside capital and to develop action plans that will be acceptable to federal regulatory authorities, but there can be no assurance that these actions will be successful, or that even if one or more of the Company's and Bank's proposals are accepted by the Company's and Bank's Federal regulators, that these proposals will be successfully implemented. *While the Company's management continues to exert maximum effort to attract new capital, significant operating losses in 2008 and 2009, significant levels of criticized assets and low levels of capital raise substantial doubt as to the Company's ability to continue as a going concern.* Doubt as to the Company's ability to continue as a going concern was previously disclosed in the Company's December 31, 2009 earnings release furnished with its February 2, 2010 Form 8-K, Current Report. If the Company is unable to achieve compliance with the requirements of the Consent Order, the FRB Agreement, the Letter and the Response Letter with the OCC and the FRB, or an acceptable CRP under the OCC's Prompt Corrective Action guidelines, and if the Company cannot otherwise comply with such commitments and regulations, the OCC could force a sale, liquidation or federal conservatorship or receivership of the Bank.

(Emphasis added).

75. On March 12, 2010, the Company filed a Form 8-K with the SEC. This fiduciary communication stated the Company received a notice from The Nasdaq Stock Market stating that because the minimum bid price of the Company's common stock was below $1.00 per share for 30 consecutive business days, the Company was therefore not in compliance with Nasdaq Marketplace Rule 5450(a)(1).

76. Defendants either knew or should have known the foregoing and they breached their fiduciary duties by failing to know that it was imprudent for the Plan to invest in and to continue to hold millions of dollars in the Company's Stock.

## THE LAW UNDER ERISA

77.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

78.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

79.     ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the Participants and beneficiaries, for the exclusive purpose of providing benefits to Participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

80.     These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence, and are the "highest known to the law." They entail, among other things:

(a)     the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance the Plan, which invested in Amcore Stock, to ensure that each investment is a suitable option for the Plan;

(b)     the duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the Participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plan's sponsor; and

(c)     a duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

81.     ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that ". . . [i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly fails to disclose, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(l), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

82.     Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(l) and ERISA § 405(a).

## DEFENDANTS' FIDUCIARY STATUS

83. ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(l), 29 U.S.C. § 1102(a)(l).

84. During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) and the law interpreting that section. As outlined herein, Defendants all had discretionary authority and control with respect to the management of the Plan and/or the management or disposition of the Plan's investments and assets, and/or had discretionary authority or responsibility for the administration of the Plan.

85. During the Class Period, Defendants' direct and indirect communications with the Plan's Participants included statements regarding investments in Company Stock. Upon information and belief, these communications included, but were not limited to, SEC filings, annual reports, press releases, Company presentations made available to the Plan's Participants via the Company's website and the plan-related documents which incorporated and/or reiterated these statements. Defendants also acted as fiduciaries to the extent of this activity.

86. In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable. To the extent any of the Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.

## CAUSATION

87. Upon information and belief, the Plan suffered millions of dollars in losses in Plan benefits because substantial assets of the Plan was imprudently invested or allowed to be invested by Defendants in Amcore Stock during the Class Period, in breach of Defendants'

fiduciary duties. These losses to the Plan were reflected in the diminished account balances of the Plan's Participants.

88.     Defendants are responsible for losses in the Plan benefits caused by the Participants' direction of investment in Amcore Stock, because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants provided inaccurate and incomplete information to the Plan Participants regarding the true health and ongoing profitability of the Company, thereby misrepresenting the Company's soundness as an investment vehicle. As a consequence, Participants could not exercise independent control over their investments in Amcore Stock, and Defendants remain liable under ERISA for losses caused by such investment.

89.     Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Amcore Stock, eliminating such Company Stock as an investment alternative when it became imprudent, and divesting the Plan from its holdings of Amcore Stock when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered.

90.     Also, reliance is presumed in an ERISA breach of fiduciary duty case. Nevertheless, to the extent that reliance is an element of the claim, Plaintiff relied to his detriment on the misstatements and omissions that Defendants made to the Plan Participants.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

91.     Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in Amcore Stock during the Class Period.   As a consequence of Defendants' breaches, the Plan suffered significant losses.

92.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary. . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes Asuch other equitable or remedial relief as the court may deem appropriate . . . ."

93.     With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duties, the Participants and beneficiaries in the Plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been, properly administered.

94.     Plaintiff and the Class are therefore entitled to relief from Defendants in the form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the fiduciary duty breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3);

(c) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d) taxable costs; (e) interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

95.     Under ERISA, each defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## CAUSES OF ACTION

### FIRST CLAIM:  INVESTMENT IN AMCORE COMMON STOCK (AGAINST ALL DEFENDANTS)

96.     Plaintiff realleges and incorporate herein by reference the allegations set forth above.

97.     Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to a plan any losses to that plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

98.     Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.  Defendants' selection, monitoring, and continuation of the investment alternatives under the Plan were subject to the above-described fiduciary duties.  By their continuing to offer Amcore Stock as an investment under the Plan, when Amcore's true adverse financial and operating condition was being concealed, Defendants breached each of these fiduciary duties.

99.     As a consequence of Defendants' breaches, the Plan suffered losses.

100. Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

101. Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

### SECOND CLAIM: MISREPRESENTATION AND NONDISCLOSURE (AGAINST ALL DEFENDANTS)

102. Plaintiff realleges and incorporates herein by reference the allegations set forth above.

103. Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to a plan any losses to that plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

104. Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

105. Defendants breached these fiduciaries in that they made material misrepresentations and nondisclosures as alleged above.

106. The Plan Participants relied upon, and are presumed to have relied upon, Defendants' material misrepresentations and nondisclosures to their detriment.

107. As a consequence of Defendants' material misrepresentations and misleading omissions, the Plan suffered losses.

108. Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

109.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

**THIRD CLAIM: DIVIDED LOYALTY**
**(AGAINST ALL DEFENDANTS)**

110.    Plaintiff realleges and incorporates herein by reference the allegations set forth above.

111.    Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to a plan any losses to that plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

112.    Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

113.    Defendants breached their fiduciary obligations when they acted in their own interests rather than solely in the interests of the Participants and Beneficiaries.

114.    As a consequence of these breaches, the Plan suffered losses.

115.    Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

116.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

**FOURTH CLAIM:  MISMANAGEMENT OF PLAN ASSETS**
**(AGAINST ALL DEFENDANTS)**

117.    Plaintiff realleges and incorporates herein by reference the allegations set forth above.

118. Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to a plan any losses to that plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

119. Pursuant to ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), Defendants were required to discharge their duties with respect to the Plan solely in the interests of the Participants with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

120. Defendants breached these duties in that the Plan invested in Amcore Stock when the price of Amcore Stock was artificially inflated and when Amcore Stock was not a prudent retirement investment, thereby failing to diversify assets so as to minimize the risk of large losses.

121. As a consequence of these breaches, the Plan suffered losses.

122. Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

123. Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

## FIFTH CLAIM: BREACH OF THE DUTY TO PROPERLY APPOINT, MONITOR AND INFORM THE PLAN ADMINISTRATOR(S) (AGAINST THE MONITORING DEFENDANTS ONLY)

124. Plaintiff realleges and incorporates herein by reference the allegations set forth above.

125.    Defendants Halbrook, Hay, Rogers, Gleeson, McManaman, Ward, Bauer, Donovan, and Iglesias-Solomon (the "Monitoring Defendants") had the duty and responsibility to properly appoint, monitor and inform the Plan Administrator(s) and/or other persons who exercised day-to-day responsibility for the management and administration of the Plan and its assets.

126.    The Monitoring Defendants failed to properly appoint, monitor and inform such persons in that the Monitoring Defendants failed to adequately inform such persons about the true financial and operating condition of the Company or, alternatively, the Monitoring Defendants did adequately inform such persons of the true financial and operating condition of the Company (including the financial and operating problems being experienced by Amcore during the Class Period identified herein) but nonetheless continued to allow such persons to offer Amcore Stock as an investment option under the Plan even though the market price of Amcore Stock was artificially inflated and even though Amcore Stock was not a prudent investment for Participants' retirement accounts under the Plan.

127.    As a consequence of these breaches, the Plan suffered losses.

128.    The Monitoring Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

129.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A       Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.      Declaration that Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.      An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

D.      Imposition of a Constructive Trust on any amounts by which any Defendants was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.      An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Amcore Stock;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendants.

Dated: April __14__, 2010

                                       **MEYER & HORNING, P.C.**

                                       By: Timothy F. Horning_____
                                       3400 North Rockton Avenue
                                       Rockford, Illinois 61103
                                       Telephone: (815) 636-9300
                                       Facsimile: (815) 636-9352
                                       Email: thmeyerhorning@aol.com

***EGLESTON LAW FIRM***
Gregory M. Egleston
360 Furman Street, Suite 443
Brooklyn, NY 11201
Telephone: (646) 227-1700
Facsimile: (646) 227-1701
Email: egleston@gme-law.com
            greg.egleston@gmail.com

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
919 North Market Street, Suite 980
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: sdr@rigrodskylong.com
Email: bdl@rigrodskylong.com

            -and-

Timothy J. MacFall
585 Stewart Avenue, Suite 304
Garden City, NY 11530
Telephone (516) 683-3516
Email: tjm@rigrodskylong.com

***Attorneys for Plaintiff***