# EXHIBIT Q

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW JERSEY
 2              CIVIL ACTION  2:03-cv-01214-DRD-SDW

 3
    IN RE: HONEYWELL ERISA       : TRANSCRIPT OF PROCEEDINGS
 4  LITIGATION                   :
                                 :      M O T I O N
 5  - - - - - - - - - - - - - -  :
                                      Pages 1 - 45
 6
                                    Date:  July 19, 2005
 7                                  Newark, New Jersey

 8
    B E F O R E:   HONORABLE DICKINSON R. DEBEVOISE,
 9                 SENIOR UNITED STATES DISTRICT JUDGE

10
    A P P E A R A N C E S:
11
    DRINKER BIDDLE & SHANLEY
12  BY:  JOHN J. FRANCIS, ESQ., and
    ROBERT ECCLES, ESQ.,
13  Attorney for Honeywell Corporation

14
    TRUJILLO RODRIQUEZ & RICHARDS
15  BY:  LISA RODRIGUEZ, ESQ. and
    SCHIFFRIN & BARROWAY
16  BY:  JOSEPH MELTZER, ESQ.,
    Attorney for the Plaintiffs

17

18
    _____
19  Pursuant to Section 753 Title 28 United States Code, the
    following transcript is certified to be an accurate record as
20  taken stenographically in the above entitled proceedings.

21  [signature: Mollie Ann Giordano]
    MOLLIE ANN GIORDANO
22  Official Court Reporter

23

24

25
```

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                    2

1      THE COURT: Good morning.  I gather you've given your

2  appearances to Miss Giordano, so we're ready to proceed.

3      Let me ask before we start in, the gentlemen back

4  here, are you here to make any comments about the settlement?

5      VOICE: No, sir.

6      THE COURT: All right.  So we have nobody appearing at

7  this point anyway to address the approval of the settlement?

8  Any other applications?  All right, well, Miss Rodriguez, are

9  you presenting this?

10      NS. RODRIGUEZ: Actually, your Honor, Mr. Meltzer will

11  be presenting on behalf of the plaintiffs today.

12      THE COURT: All right.  Mr. Meltzer, go ahead.

13      MR. MELTZER: Good morning, your Honor.  We are very

14  pleased to be here today.  We are here to present the

15  settlement in all the claims in the Honeywell ERISA litigation.

16  The settlement is a product of a rather lengthy, sometimes

17  rather intense negotiations between the parties.  Your Honor,

18  to summarize what the settlement provides for, monetary and

19  structural relief.  On the monetary side, it calls for 14

20  million dollars to pay into the Honeywell plans.  It will be

21  distributed to the participants and further pro rata share, and

22  in accordance with how much they may have lost due to their

23  investments in Honeywell stock.  Your Honor, if I could, one

24  bit of housekeeping.  We had submitted a plan.

25      THE COURT: And I gather you propose not to pursue

Colloquy                                    3

1    that this morning?

2             MR. MELTZER:  That's right.

3             THE COURT:  We will address that question later.

4             MR. MELTAER:  It's largely worked out, and I think

5    there's some details that I think we need to finalize, and the

6    parties will get together and submit something in due course.

7             With respect to the structural part of the settlement,

8    previously the Honeywell plan provided that participants cannot

9    invest their money in anything but Honeywell stock until they

10   were 55, and had accumulated 10 years of service in the plan.

11   Those restrictions have been lifted or unlocked, so to speak,

12   so now participants can move their money about in any of the

13   plans in investment alternatives.

14            The other motion before your Honor today is counsel's

15   motion for fees, expenses, and payment of case contribution

16   orders; namely, plaintiffs.

17            With respect to the motion for approval of settlement,

18   we seek the Court's finding that the settlement is fair,

19   adequate, and reasonable under Rule 23 and the Third Circuit

20   standards.  We also seek final certification of settlement

21   class, and I can give you a brief background of the litigation

22   to this point.

23            THE COURT:  All right.

24            MR. MELTZER:  Okay.  The cases were initially filed in

25   March, 2003.  They allege breaches of fiduciary duty under

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

```
                              Colloquy                          4
1    ERISA, specifically Section 409 and 502 of ERISA.  There were
2    two cases filed.  They were ultimately consolidated in May of
3    2003.  There was a consoldation and organizational order
4    entered by the Court.  At that time, my firm and Ms. Rodriguez
5    leads with the liaison counsel, and we secured certain
6    documents, ERISA-related documents that relate to the governing
7    of the plan.  They are essentially the trust agreement and all
8    the governing instruments under which the plans are operated.
9            We then continue by our investigation of the claims,
10   and essentially to prepare the filing of the consolidated
11   complaint.  The consolidated pleading was filed on July 28,
12   2003.  It is fairly long, it's fairly detailed, it essentially
13   groups three sets of defendants, Honeywell International,
14   members of the retirement plan's committee, members of the
15   company's investment committee, and it sets out a variety of
16   allegations relating to why Honeywell stock, at least
17   plaintiffs allege, was imprudent during that period.  Problems
18   that the company was having related to certain mergers, Allied
19   Signal mergers.  Also a contemplated merger with General
20   Electric.  Claims for relief based on breach of fiduciary
21   duties under ERISA; to monitor fiduciaries under ERISA; and
22   also prohibit transactions.
23           Following the filing of that consolidated pleading,
24   that touched off some motion practice.  Defendants moved to
25   dismiss the complaint, and we of course opposed it.
```

Colloquy                                    5

1       THE COURT: You're familiar with what took place here

2   in court?

3       MR. MELTZER: That ultimately resulted in oral

4   argument before your Honor, and ultimately an order granted in

5   part, denied in part, defendant's motion.

6       At that time the parties were also engaged in class

7   certification discoveries as a result of the magistrate waiting

8   to enter an order bifurcating discovery in the matter. We were

9   engaged in propounded discovery, compounded discovery. We had

10  several meet and confer sessions, some rather lengthy, some

11  rather contentious, but we ultimately framed a couple of issues

12  for the Court. We had a couple of motions to compel pending

13  the time the settlement was reached.

14      The other aspect of the litigation that I would point

15  out is that the ERISA plaintiffs and counsel here today appear

16  before your Honor in the securities case because there was some

17  question if they were reached in their case.

18      THE COURT: What was the settlement figure in that

19  case?

20      MR. MELTZER: In the securities litigation?

21      THE COURT: Yeah.

22      MR. MELTZER: I believe it was a hundred million

23  dollars.

24      Yeah, we appeared at the fairness hearing in the

25  securities litigation to make sure the relief was not -- could

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.   (973) 220-9465

Colloquy                                                    6

1    not be read to the certain defense in this litigation.

2    Settlement discussions began sometime in the spring of '04, and

3    frankly, your Honor, I believe they were touched off by an

4    inquiry you made during the contest of a securities hearing as

5    to whether class counsel in the ERISA case has begun a

6    settlement dialogue. And we're appreciative of that fact,

7    because sometimes that's just the kind of push the parties need

8    to talk about settlement in a fruitful way. We had rather

9    protracted settlement discussions.

10          There is essentially two grounds, if you will, in

11   negotiation. We had asked your Honor to refrain from issuing

12   his opinion on the motion to dismiss, sort of insuring the

13   maximum amount of uncertainty while settlement talks were

14   proceeding. We reached an impasse at some point. We then

15   contacted your Honor and asked that you issue your opinion.

16   And after it's received, we sort of picked up on settlement

17   negotiations at that time.

18          Beyond the settlement, we went over the terms of the

19   actual agreement. We proceeded with some confirmatory

20   discovery that involved largely the production of. Corporate

21   minutes, there are two committees I mentioned before,

22   Retirement Plan Committee that deal with operations an

23   administration of the plans. We reviewed some of those

24   minutes. We talked to a large --

25          THE COURT: How far will discovery proceed in the

Colloquy                                    7

1    securities class action?  Have they gotten into merits

2    discovery.

3              MR. MELTZER:  My involvement was limited, your Honor

4    But as I understand it, I think they were well into merits --

5              THE COURT:  Well, the point of my question is, were

6    you able to draw on the information and discovery in that case

7    to assist you in this case?

8              MR. FRANCIS:  Judge, if I may, I was the only one who

9    was in both cases.  There were a limited number of depositions

10   in the securities litigation, fair amount of document

11   discovery, and very little depositions.

12             THE COURT:  And the document discovery?

13             MR. FRANCIS:  Yes, yes, a fair amount of that.

14             MR. MELTZER:  The only thing I can say, your Honor, in

15   direct response, I didn't have access to anything that went on

16   in the securities litigation, with the exception of pleadings

17   that were filed.

18             THE COURT:  And there were motions filed --

19             MR. MELTZER:  Right.

20             THE COURT:  -- in that case.  And I assume you've

21   followed whatever was going on in the court?

22             MR. MELTZER:  Yes, especially with respect to

23   settlement.  You do what you have to do.

24             THE COURT:  All right.

25             MR. MELTZER:  Beyond that, that's sort of where our

Colloquy                    8

1    involvement ended.

2            THE COURT:  All right.

3            Well then, what was the data on which you relied in

4    determining the merits of your case?

5            MR. MELTZER:  Your Honor, we got both the

6    ERISA-related documents, we did a lot of precomplaint sort of

7    informal discovery.  Anything that we were able to obtain from

8    probable available sources, SEC filings, the DOL, anything that

9    we got from the defendants, both before the complaint was filed

10   and in the context of discussing settlement.  That's the kind

11   of information we relied upon.  There included information with

12   regard to the insurance that the company had taken out for

13   fiduciary claims, it included information regarding the plans,

14   purchases, and sales of Honeywell stock during the time period.

15   Again, the minutes of the committees that were assessing the

16   propriety in investing in Honeywell stock were produced the day

17   after the agreement was reached in a confirmatory capacity.

18   There was, in addition to whatever we got in the context of

19   class certification, the discovery, in the way of discovery

20   responses.  Frankly speaking, I'm not sure how much that

21   dovetails to the merits of the claim.  It did somewhat, but

22   that's not entire overlapping.

23           THE COURT:  All right.

24           MR. MELTZER:  There was a fairly substantial amount of

25   information that we were -- that we had access to, both in the

Colloquy                                      9

1    context of preparing for our complaint and the motion practice,

2    and in proceeding with settlement negotiations that I think

3    span settlement -- six or seven months.

4            THE COURT: Good. Okay.

5            MR. MELTZER: Your Honor, I would just like to touch

6    real briefly on the structural relief part of the settlement.

7    We are particularly pleased with that. There is a -- there is

8    a report that we would draw your Honor's attention to that

9    we've submitted with our approval papers. It's from a

10   Professor Ramaswamy. He is a professor -- he sort of is a

11   specialist in trying to quantify what value it brings. He puts

12   a broad range in terms of value, less concerned about what the

13   actual value is, and more concerned that people are going to be

14   able to kind of spread our investments out over a variety of

15   investments, especially if they see some kind of down turn in

16   any particular sector of the market. It helps to mitigate

17   against these kinds of claims going forward, otherwise I can

18   rely on the submission, and we're not seeking a fee on the

19   value that he quantifies, fairly large.

20           THE COURT: And it's pretty speculative --

21           MR. MELTZER: Yeah, it is.

22           THE COURT: -- value?

23           MR. MELTZER: Well, it's speculative in one sense

24   because obviously you're not dealing with people and their

25   investment decisions in the future. And on the other hand,

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.   (973) 220-9465

|  | Colloquy | 10 |

1    it's fairly empirical, and it's at least well reasoned, and

2    it's actually based on actual data.

3            With respect to settlement as a whole, both the

4    monetary and structural components of it, we would ask that the

5    Court enter a finding that it's fair, reasonable, and adequate,

6    under Rule 23E, within the Third Circuit.  There is a nine

7    factor test.  Frankly, preliminarily, your Honor, the

8    settlement is presumptively fair under Third Circuit case law.

9    It was negotiated at arm's length.  There was sufficient

10   discovery so counsel could assess the merits, and counsel has

11   experienced a similar action, and only a small portion of the

12   class objected.  And those are inadequate notice to the class

13   participants, and I'll touch on that in a second.  Those are

14   the elements for sort of a presumptive finding of fairness.

15           With respect to notice, the notice in this case, and

16   it's a non-class, those standards are lower or somewhat

17   relaxed.  Frankly, the notices in this case were outstanding.

18   There were individual notices mailed out to over a hundred

19   thousand participants.  There was publication in the USA Today,

20   the Minneapolis Star Union.  There was a web site that we made

21   available through the claims administrator which gave everybody

22   information regarding the settlement, including court

23   documents, that had twenty-thousand, two hundred hits in the

24   small amount of time since notice was effectuated.

25           Despite the notice efforts, there were roughly 18

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.   (973) 220-9465

Colloquy                                11

1   objections, as I counted them.  Given the size of the class,

2   that's a rather small number.

3            With respect to the Dirsh factors, I can run through

4   those fairly quickly.  The first factor, and this is the

5   nine-factor test that the Third Circuit has enunciated, I think

6   it's a 1975 case, but it's been reiterated and reiterated.  The

7   first factor is complexity and likely duration of the

8   litigation.  Your Honor, these are fairly novel claims, and

9   these are fairly new lines of cases.  The case law, as your

10  Honor probably knows from issuing the opinion, is very

11  unsettled.  There is a lot of inherent complexities.  Courts in

12  this district alone have noted the difficulties in trying to

13  prove one of these cases and advance it all the way to trial.

14  The expense and likely duration of the litigation, had we not

15  settled at this point, the litigation probably would have gone

16  on for at least another year.  And a factor of that, the

17  expense would have been very considerable.  Experts in this

18  kind of case alone are in the hundreds of thousand of dollars.

19  Document production would have cost some factor of that.  So

20  that factor militates in favor of approval of the settlement.

21           The second Dirsh factor is the reaction of the class

22  to the settlement.  As I say, your Honor, there were roughly 18

23  objectors.  Given the size, winds up to be .01 percent of the

24  class.  The other thing to note about the reaction of the

25  class, some say too little in terms of settlement, some say

Colloquy                              12

1    it's far too much.  We seem to obstruct that.

2              THE COURT:  Well, I guess you had a few people who

3    just don't like class action or class action lawyers.

4              MR. MELTZER:  Unfortunately, your Honor, the person in

5    my position is always the case.  There are always people who

6    are dissatisfied with the way Rule 23 operates.  By and large

7    the class is -- by not objecting is sort of affirming the

8    reasonableness of the settlement, and I think that factor also

9    militates in favor of the finding fair and reasonable.  The

10   proceedings and the amount of discovery, as we discussed

11   previously, the case was settled after your Honor issued the

12   motion to dismiss.  Class certification, the discovery was

13   ongoing at the time.  The class, as I addressed briefly,

14   earlier, class certification and discovery was proceeding

15   because it hadn't bifurcated at that point.  Merits discovery

16   has been stayed, despite our objection.  We lost on that one.

17   Class certification discovery was determined first, and then

18   subsequent to a finding on class certification, we were to move

19   into merits discovery.  We had discovery that was produced

20   informally] before the complaint was filed.  We had a lot of

21   publicly available information.  We had dozens and dozens of

22   participants who had contacted my firm, who gave us

23   information.  We also ad information that was produced in the

24   context of negotiating the settlement.  All of those factors

25   essentially amounts to us having clearly a considerable amount

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                                    13

1   of information and enough information that we can assess the

2   propriety of moving forward with this settlement today.

3          The fourth and fifth test of the Dirsh test is showing

4   liability.  These are difficult cases, as I touched on briefly.

5   There is a dirth of case law with respect to whether the cases

6   are meritorious and can go forward on any number of fronts,

7   whether it's in the face of a presumption or in terms of

8   standing to bring the claims.  There is a District Court

9   opinion, your Honor, in this district shortly before you issued

10  your opinion on the motion to dismiss, which dismissed all the

11  claims in analogous actions based on standing and the inability

12  to proceed in this type of action.  There is a limited number

13  of circuit court decisions that guide us.  And frankly, I have

14  felt we had strong claims with respect to liability, as the

15  defendants I'm sure think they have very strong offenses with

16  respect to liability.

17          In terms of damages, this particular case is not a

18  sort of fraud of the century, if you will.  It's not an Enron

19  or Worldcom.  It's not a case where the company spiraled into

20  bankruptcy.  I think the close, the trade was somewhere up to

21  forty dollars a share.  It's obviously a viable company.

22  Factor that with the sort of performance of the stock, visa-vie

23  the market during the time period, and whether it

24  underperformed or out performed certain indexes, damages would

25  be a very difficult proposition for us to prove.  There was a

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                                                14

1   drop in the stock obviously between the beginning and end of

2   our class period.  Whether we could tie that to the specific

3   fiduciary action or inaction, obviously is something that we

4   would only ote if we proceed through an entire trial.  But

5   based upon our experience in other cases, this was a difficult

6   case in terms of trying to prove up the actual damages.  And

7   frankly, your Honor, if you look at the memorandum that the

8   defendants filed yesterday, we would have been lucky to prove

9   any damages at all, based on the statements made in that

10  memorandum.

11          The sixth Dirsh factor is the risk of maintaining a

12  class action through trial.  Frankly, your Honor, I think the

13  class would have been certified.  I think these cases make for

14  perfect class actions under 23D-1.  I think they said all the

15  elements of 23A pretty clearly, and the cutting against that of

16  course is that the defendants had already undertaken a very

17  aggressive class certification.  And in light of that, they

18  would have attacked the accuracy of our named plaintiffs.  We

19  were preparing for depositions at the time we settled.  There

20  was certainly a risk that we wouldn't be able to maintain a

21  class at trial, albeit I think a small one.

22          The seventh Dirsh factor is the ability of the

23  defendants to withstand a greater judgment.  Your Honor, we

24  don't challenge whether Honeywell could sustain a greater

25  judgment than what we would have secured here.  This factor

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                        15

1   standing alone doesn't preclude the entry of a settlement.  I

2   think the waiver and anti-trust case in the Third Circuit, just

3   because the company could pay more, doesn't mean that the

4   settlement shouldn't be approved.  You have to look at all the

5   other compliments and all the other factors.

6          The eighth and ninth factors within the Dirsh test are

7   the range of reasonableness of the settlement in light of the

8   best possible recovery and the range of reasonableness of the

9   settlement fund to possible recovery in light of the attendant

10   risks of litigation.  Frequently they are analyzed together.

11   The Third Circuit has pointed out that this settlement, these

12   factors should be interpreted essentially as to whether the

13   settlement represents a good value for a relatively weak case.

14   In light of some of the problems, not only in terms of the law,

15   but as they apply to the facts of this particular case, clearly

16   a solvent company and very viable company.  I think this is an

17   excellent result, both in terms of securing almost all the

18   fiduciary liability policies, despite the fact that there was a

19   denial of coverage and very -- essentially, when you -- base it

20   again on the risk that we wouldn't be able to get anything at

21   all, it's an excellent recovery.  And when you base it against

22   the best possible recovery, and the problem we would have, I

23   think again the factor is clearly supportive of approving the

24   settlement.

25          Finally, the motion for approval seeks final

Colloquy                                    16

1   certification of the settlement classes.  Obviously it's not

2   opposed by the defendant's settlement classes.  Any person who

3   is a participant in the --

4            THE COURT:  I don't think you have to read the

5   definition over.

6            MR. MELTZER:  That's set forth in the papers.  We

7   think it clearly meets all the Rule 23 requirements, and we

8   would seek certification of the settlement class under 23A, and

9   then 23B(1) and B(2).

10           THE COURT:  All right.

11           MR. MELTZER:  There's all I have with respect to

12  approval, your Honor.

13           THE COURT:  Then we get to the application for fees

14  and expenses.

15           MR. MELTZER:  Okay.

16           Your Honor, we submitted a motion for attorney's fees,

17  reimbursement for expenses and case contribution.  We requested

18  25 percent of the settlement fund that nets out to 3.5 million

19  dollars, as well as reimbursement of forty-three thousand,

20  eight hundred and eighty-seven dollars in expenses as well as

21  an award of twenty-five hundred dollars for each of the named

22  plaintiffs.

23           THE COURT:  In the securities class action I awarded

24  20 percent.

25           MR. MELTZER:  Yes.

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9466

Colloquy                                          17

1       THE COURT:  Is there some reason why there should be a

2   higher percent in this case than in that case?

3       MR. MELTZER:  Your Honor, the answer I guess is, given

4   the higher number, sometimes when you have higher awards,

5   courts will take the percentages down and the Third Circuit

6   called it frankly the range of settlement.  The fee awards in

7   these types of cases have been between 20 and 30.  I think 25

8   is reasonable.  I think it is, in light of the multiplier, it

9   is certainly reasonable.  I think these are a little more novel

10  in terms of whether we'd ever be able to to recover anything,

11  including our times, as opposed to security litigation --

12      THE COURT:  You see a greater risk.

13      MR. MELTZER:  There's somewhat of a greater risk in

14  this action.  Beyond that, I think -- you know, if you look at

15  the factors, the Third Circuit sets out, I think, given the

16  complexity, and I think your Honor said the risk of not payment

17  all at all, and there was a fairly substantial risk of

18  nonpayment, particularly after that District Court opinion in

19  New Jersey that dismissed the claims, which came down before --

20  before we settled.  I think that militates in favor of a

21  slightly higher percentage, especially when you couple that

22  with the fact that it's a smaller aggregate amount, which

23  doesn't require sort of a slide back.  They call it a slide

24  back on a mega settlement fund.  And there's also fairly --

25  again, I believe very substantial and valuable structural

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                    18

1    relief that is attendant to the settlement, for which we're not

2    seeking any fee at all.

3            THE COURT:  All right.  And I guess that's to the --

4    to the case contribution payment to the named plaintiffs.  I

5    don't see that as much of a problem.  How many named plaintiffs

6    do you have?

7            MR. MELTZER:  Six.

8            THE COURT:  All right.  I guess that's all the

9    applications you've got.

10           MR. MELTZER:  I believe so.

11           THE COURT:  Mr. Francis.

12           MR. FRANCIS:  Your Honor, Mr. Eccles has a few brief

13   remarks to make.

14           MR. ECCLES:  Thank you, your Honor.  And I will be

15   brief.

16           Let me exercise the main points why we think this

17   settlement should be approved.  First, it's clearly an arm's

18   length settlement.  This was an adversarial process the way

19   it's supposed to be.  I say not at all uncivil, but contentious

20   is not a bad word to use.  We were litigating this hard and the

21   settlement stopped there.  It's also that both Mr. Meltzer's

22   firm and my firm have many other cases that look a little like

23   this, and we've been through this, and have the able to assess

24   what cases are worth, and what cases should go forward.  And

25   from a procedural viewpoint, I don't think that's any question

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.   (973) 220-9465

Colloquy                                    19

1   that all the class procedures and notice were more than

2   adequate to provide notice to the class.

3           From our point of view, and we put this in submission,

4   so I'll be very brief, from the defendant's point of view, we

5   thought we had terrific defenses.  And the court defense in a

6   nutshell was the stock market went down, and the Honeywell

7   stock went down with it, and there's nothing extraordinary

8   about that.  No fraud, no nothing else.  And we cited that one

9   of the other funds, a gross equity fund within these plans the

10  participants could have put their money in, actually it went

11  down more than the Honeywell stock over each of the three big

12  years involved here.

13          And so we thought we had an excellent set of defenses,

14  your Honor.  But like most cases, nothing certain, except that

15  they'll be a lot of expenses, I think an additional year of

16  litigation would have been an extremely optimistic viewpoint.

17  There would have been a lot of depositions and a lot more

18  document discovery.  And so from our viewpoint, it made sense

19  for both sides to get together and talk, and that's exactly

20  what we did.  And reached a settlement, which I think is

21  definitely an arm's length settlement, definitely a fair

22  settlement to the class.

23          The one other point we make, your Honor, is although

24  some of the objectors did focus on the fees, which is not our

25  issue, it's a separate issue from the fairness of the rest of

Colloquy                                      20

1   the settlement, and I think will effectively get taken care of

2   when the Court approves whatever fee is fair.  And unless the

3   Court has questions with that, we ask the settlement be

4   approved.

5           THE COURT:  All right.  Thank you.

6           Anyone else at the counsel table want to speak.

7           MR. MELTZER:  Only to point out for the record, and I

8   think Mr. Eccles knows this, to the point where I was

9   contentious, to the extent I say contentious, and it was not

10  well taken on the other side, it was not my intent.  It was a

11  hard fight, I should have said.

12          THE COURT:  I didn't take it in any invidious sense.

13  Is there a Mr. Smith in the courtroom?  I think he filed a

14  notice and wanted to be heard.  All right.  And there's nobody

15  else who has appeared either in favor of, or in opposition to

16  the settlement.

17          I think it's important or useful at least to resolve

18  the matter at this point, so I'm going to impose upon you to

19  read a rather lengthy opinion into the record.  I'll reserve

20  the opportunity to correct any transcript which results from

21  that before it's officially made a part of the record.

22          This action was commenced on March 17th, 2003, when

23  Plaintiff Richard Ramseyer, a participant in the Honeywell

24  Savings and Ownership Plan I, filed a class action complaint

25  asserting claims under the Employee Retirement Income Security

Colloquy                              21

1    Act of 1974 (ERISA).  The Ramseyer action sought relief for

2    losses to the Honeywell Savings and Ownership Plans I and II,

3    (collectively the "Plan").  On May 8th, 2003, the Ramseyer

4    action was consolidated with Freund v. Honeywell International,

5    Inc., et al., 03-cv-1626 (District of New Jersey), a related

6    action involving similar allegations and claims.  The order of

7    consolidation also appointed Shiffren & Borroway, LLP and

8    Trujillo Rodriguez & Richards, LLC as lead and liaison counsel

9    for plaintiffs, respectively.  Plaintiffs filed a consolidated

10   complaint for breach of fiduciary duty on July 28th 2003.

11          After extensive investigation, and a motion to dismiss

12   the complaint, a hearing on the motion, class discovery and

13   settlement discussions, the parties arrived at a settlement.

14   Upon motion of the plaintiffs, the Court preliminarily approved

15   the settlement, conditionally certified a settlement class

16   pursuant to Federal Rule of Civil Procedure 23, approved a

17   notice plan and scheduled a final fairness hearing.  The case

18   is now before the Court for certification of a settlement

19   class, a ruling upon the fairness, reasonableness and adequacy

20   of the settlement, approval of the cash contribution awards for

21   named plaintiffs, and award of attorneys' fees and expenses.

22   Originally plaintiffs moved for final approval of a plan of

23   allocation, but both plaintiffs and defendants have requested

24   this motion be a adjourned for a brief period to permit

25   refinement to be made in the plan.

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.   (973) 220-9465

1       First, proceedings.  The consolidated complaint names

2  the defendants Honeywell, members of the Company's Retirement

3  Plans Committee, members of the Company's Pension Investment

4  Committee, and Michael R. Bonsignore, Chairman and CEO of

5  Honeywell from April 2000, through June, 2001.  The

6  consolidated complaint alleges, inter alia,, that defendants

7  breached their fiduciary duties by allowing the Plan to

8  purchase and hold Honeywell common stock at a time when

9  Honeywell stock was an imprudent investment.  In particular,

10  plaintiffs allege that the Plan was allowed to accumulate and

11  maintain, through company-encouraged participant investments

12  and company-matching contributions, a large position in

13  Honeywell common stock.

14       According to plaintiffs, such a heavy single-equity

15  investment, in addition to being inherently risky, was

16  particularly imprudent, given the persuasive problems that

17  beset the company stemming from the consummated Allied Signal

18  transaction, and the failed General Electra merger, the

19  ramifications of which defendants were fully aware.  Further,

20  plaintiffs allege that Honeywell and certain individual

21  defendants made material misrepresentations through Securities

22  and Exchange Commission filings and other public

23  pronouncements, and withheld pertinent information, that

24  compromised participants' ability to make informed investment

25  decisions.  When the company finally disclosed that the Allied

Colloquy                                23

1   Signal transaction resulted in expensive operational problems

2   and substantial customer losses, and that the General Electric

3   merger would not be effectuated, the Plan's assets were

4   depleted as the value of the Honeywell stock declined.

5           The consolidated complaint further alleges that

6   defendants are liable under ERISA as a result of their:  One,

7   engaging in prohibited transactions involving the Plan's assets

8   with parties-in-interest; two, failing to properly monitor and

9   provide material information to the Pension Investment

10  Committee; three, allowing or abetting fiduciary breaches of

11  their cofiduciaries; and four, failing to avoid or remedy

12  inherent conflicts of interest between their corporate

13  interests and their fiduciary responsibilities to the Plan

14  under ERISA.  The consolidated complaints seeks plan-wide

15  relief under Section 409 and 502 of ERISA.

16          Plaintiffs' counsel conducted a thorough investigation

17  into these allegations.  They reviewed documents produced by

18  defendants and publicly-available materials related to the

19  company and the Plan.  They analyzed specific corporate

20  transactions and interviewed Plan participants.  In addition,

21  counsel derived certain information from a securities class

22  action initiated in 2000 in this court and which involved many

23  factual allegations relevant to the claims in this action.  In

24  re Honeywell Securities Litigation, No. 00-3605.

25          Defendants vigorously contested the litigation.  On

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

|  | Colloquy | 24 |
|---|---|---|

1   September 29th, 2003, they filed a motion to dismiss.  After

2   extensive briefing, oral argument was heard on January 26,

3   2004, after which there was further briefing.

4          During this period the parties engaged in a extensive

5   litigation concerning class action discovery issues.  On

6·  January 14th, 2004, Magistrate Judge Wigenton, over plaintiffs'

7   objections, bifurcated class and merits discovery, staying

8   merits discovery pending resolution of plaintiffs' motion for

9   class certification.

10         Also during this period the parties to the parallel

11  Securities Class Action settled.  It was necessary for

12  plaintiffs' counsel in the instant case to ensure that the

13  settlement in that action and its release of claims did not

14  affect plaintiffs' ability to pursue relief in this case.

15         Beginning in the spring in 2004, the parties commenced

16  settlement negotiations and exchanged information relevant to

17  that subject, such as performance of Plan investments during

18  the relevant period, insurance available to satisfy any

19  possible judgment, including documents evidencing denial of

20  coverage under the fiduciary insurance policy, settlement in

21  analogous cases, the precise number of Honeywell shares held by

22  the Plan, and demographic information for participants as a

23  means of measuring the impact of proposed structural changes to

24  the Plan.

25         The parties requested the Court to refrain from

Colloquy                              25

1    issuing its ruling on defendants motion to dismiss while
2    settlement negotiations were ongoing.  In early September 2004,
3    the parties reached an impasse.  Notified of this development,
4    the Court on September 16, 2004, issued its opinion and order
5    granting the motion to dismiss with respect to plaintiffs'
6    prohibited transaction claims and claims for monetary relief
7    under ERISA, Section 502(a)(3) and denying the motion in all
8    other respects.  In re Honeywell International ERISA
9    litigation, 2004, U.S. District, LEXIS 21585, (District of New
10   Jersey, 2004).
11          Upon issuance of the court's opinion, the parties
12   resumed class certification discovery and resumed settlement
13   negotiations.  Ultimately agreement was reached, resulting in
14   the agreement now before the Court for approval.  Two, the
15   proposed settlement.
16          The settlement agreement provides the defendants shall
17   pay $14 million into an interest-bearing escrow account. (the
18   "Settlement Fund").  The principal (less amounts expended for
19   certain approved costs) will accrue interest between
20   preliminary approval and distribution.  The net amount of the
21   settlement funds, including interest, and after payment of, and
22   establishment of reserves for, any taxes and Court-approved
23   costs, fees and expenses (including and Court-approved
24   compensation to be paid the named plaintiffs), will be paid to
25   the Plan.  After payment of implementation expenses, the

1    remaining amount will be allocated to the Plan accounts of

2    members of the settlement class according to a Plan of

3    allocation to be approved by the Court.

4          In addition, the settlement agreement provides for

5    certain structural changes in the Plan.  The operative

6    documents of each Plan will be amended to state that each Plan

7    participant who is or has become one hundred percent vested in

8    his or her Company Matching Contribution Account shall have the

9    right to direct the investment of his or her Company Matching

10    Contribution Account balance in the same manner and among the

11    same investment alternatives as are available for the

12    investment of employee contributions to the respective plans.

13    This provides participants with the ability to diversify rather

14    than being required to remain invested in Honeywell stock.

15    Plaintiffs retained Professor Krishna Ramaswamy of the Wharton

16    School at the University of Pennsylvania to analyze the

17    structural term of the settlement and estimate the value to the

18    Plan and its participants of the unlocking of Company matching

19    contributions, past and future.  The expert provided a detailed

20    report of his analysis and estimated that allowing the Plan's

21    participants to diversify company-matching contributions

22    previously "locked" into Honeywell stock would provide a

23    benefit of between $34.1 million to $211.4 million, depending

24    primarily on the percentage of the Plan's Honeywell equity

25    investments originating from company-matching contributions.

Colloquy                                27

1          The notice to Plan participants advised that class

2     counsel would file a motion for payment of attorneys' fees of

3     up to 30 percent of the settlement fund, plus expenses of

4     litigation, notice and settlement administration, and case

5     contribution awards for the named plaintiffs.

6          Three, class certification.  Plaintiffs urge

7     certification of the following class for settlement purpose.

8     "Any person who was a participant in the Honeywell Savings and

9     Ownership Plan I and II and/or the predecessor Plan named the

10    Data Instruments, Inc. Employee Stock Ownership Plan, the

11    Honeywell DMC Savings Plan, and the Honeywell Savings and Stock

12    Ownership Plan (collectively the "Plan" or "Plan,") at any time

13    between December 20, 1999 and February 28, 2005 (the "class

14    period") and whose Plan accounts included investments in the

15    Honeywell Common Stock Fund, or a beneficiary, alternate payee

16    representative, or successor-in-interest of any such person

17    (the "settlement class")."

18         Rule 23(a) sets forth four prerequisites to class

19    certification:  One, numerosity; two, commonality; three,

20    typicality; and four, adequacy of representation.  Each of

21    these requirements is met.

22         The class is sufficiently numerous because the number

23    and diverse location of putative class members is such that it

24    is impractical to join all of the class members in one action.

25    There are more than 100,000 potential class members, which

Colloquy                                    28

1    clearly satisfies the numerosity requirement.

2              There is commonality when the proposed class

3    representatives share at least one question of law or fact with

4    the claims of the prospective class.  In the present case, the

5    principal question of law and fact applicable to all

6    participants is whether the defendant breached fiduciary duties

7    owed to the Plan and its participants in allowing the

8    maintenance of existing, and addition of new, heavy investments

9    in Honeywell common stock when defendants knew or should have

10   known of its operational problems and accounting irregularities

11   which negatively affected the prudence of Honeywell stock as an

12   investment of the Plan during the class period.  It is

13   unnecessary to catologue the several other commons question of

14   law and fact that exist as to all members of the class and

15   predominant over any questions affecting solely individual

16   class members.

17              The proposed class representatives' claims arise from

18   the same event or course of conduct that gives rise to the

19   claims of the other class members and are based on the same

20   legal theories.  Class plaintiffs share the incentives of the

21   absent class members to pursue this action to its conclusion.

22   Typicality can be met in class actions brought for breaches of

23   fiduciary duty under ERISA and is met here.  In re Ikon Office

24   Solutions, Inc., 191 Federal Rule of Decisions, 457, 465

25   Eastern District of Pennsylvania, 2002).  Each class member was

Colloquy                                         29

1   an employee of Honeywell, a participant in the Plan during the

2   class period, and had part of his or her individual Plan

3   investment portfolio invested in Honeywell stock during that

4   time.  All Plan participants sustained injury arising out of

5   defendants' alleged wrongful conduct and plaintiffs bring their

6   claims pursuant to ERISA Sections 409 and 502(a)(2) for

7   Plan-wide relief; so any relief obtained for such claims would

8   enure to the Plan as a whole and, derivatively, its

9   participants during the class period.

10          The class representatives meet the adequacy

11   requirement of Rule 24(a)(4).  They have represented and will

12   represent the members of the class so as to fairly and

13   adequately protect the interest of the class.  The named

14   plaintiffs have no interest antagonistic to the class and are

15   in the same position as all all other members.  Class counsel,

16   Schiffren & Barroway, LLP has had extensive experience in

17   litigating complex ERISA breach of fiduciary duty class

18   actions.

19          While it is necessary for class certification to

20   qualify under only one of the requirements of Rule 23(b),

21   plaintiffs in the instant case qualify under all three.

22          They qualify under Rule 23(b)(1)(a) and (B).  The

23   relief to be accorded is Plan-wide.  Failure to certify could

24   expose defendants to multiple lawsuits and risk inconsistent

25   decisions.  Failure to certify would create the risk that

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                          30

1    future plaintiffs would be without relief.  Rankin v. Rots, 220

2    Federal Rule of Decisions 511, 523 (Eastern District of

3    Michigan, );, Ikon 191 F.R.D. at 466.

4               Although the proposed class meets the requirements of

5    Rule 23(b)(2), and Rule 23(b)(3), no further discussion is

6    warranted, as the Court will rely on Rule 23(b)(1) alone.

7               In sum, the action will be certified as a class action

8    under Rule 23(a) and (b) on behalf of the plaintiffs' proposed

9    class.

10              Four, Objections to Settlement.  Eighteen persons have

11   lodged specific objections to the settlement terms and/or to

12   plaintiffs' request for attorneys' fees and expenses, and case

13   contribution awards for the named plaintiffs.  One person, Mr.

14   Steven K. Smith, wished to be heard at the hearing to express

15   his objections.  He did not appear at the hearing.  These 18

16   objectors represent .016 percent of the more than one hundred

17   and fifteen thousand settlement class members to whom

18   individual notice of the settlement was sent.  The Court has

19   read and considered each objection with care.

20              A few are from persons who object to this class action

21   proceedings per se, either because they do not believe in class

22   actions as a matter of principle, or because the concept of

23   awarding substantial attorneys' fees to attorneys who take on

24   class action cases offends them, or because they believe

25   Honeywell voluntarily turned over shares of its stock to the

1    Plan, and employees who benefited from these contributions

2    should not sue their benefactor Honeywell.  While these views

3    are entitled to respectful consideration, they have in effect

4    been rejected when the Court did not grant defendants' motion

5    to dismiss and proceeded with the case.  They cannot be

6    advanced again at this time.

7            There are objections either to the settlement or to

8    the payment of attorneys fees.  The objections must be treated

9    with utmost sympathy, because they are submitted by persons who

10   believe that they have been grievously injured by the conduct

11   of the defendants as charged in the complaint.  Some are by

12   employees who had worked loyally for the company for many years

13   and had counted on their interests in the Plan to provide

14   comfortable old age, an expectation that in some cases has not

15   been fulfilled.  A few others assert that they had been close

16   to the management of the Plan and had expressed doubts about

17   the way they were being handled during the class period,

18   warnings that had been ignored.

19           The objections generally address three aspects of the

20   settlement.  A number of them attack the adequacy of the

21   settlement award, others challenge the 30 percent potential

22   attorneys' fee request; a few challenge payment of a cash

23   contribution award to the named plaintiffs.  In their

24   submissions, plaintiffs have discussed each objector's

25   contentions, explaining why they believe they are not a basis

Colloquy                                                32

1    for rejection of the proposed settlement.  Each of these

2    objections will be addressed generally in the context of the

3    discussions of these subjects in the sections of the opinion

4    that follow.

5         Five, Fairness, Reasonableness and Adequacy.  The

6    fairness reasonableness and the adequacy of the settlement

7    agreement is supported by the prevailing circumstances.

8    Settlement of disputed claims, especially those advanced in

9    complex class action litigation, are favored by the courts.

10   The Court of Appeals affords an initial procedural presumption

11   of fairness of a settlement if adequate notice was given to

12   affected members of the proposed settlement class and "if the

13   Court finds that (1) the negotiations occurred at arm's length;

14   (2) there was sufficient discovery; (3) the proponents of the

15   settlement are experienced in similar litigation; and (4) only

16   a small fraction of the class objected."

17        In re Cendant Corporation Litigation, 264 F. 3d 201,

18   223, Note 18 (3rd Circuit 2001).  As described above, each of

19   these four factors was fully met in this case.

20        Beyond these procedural criteria, courts in this

21   Circuit apply the nine-factor test enumerated in Girsh v.

22   Jepson, 521 F. 2d 153, 157 (3rd Circuit 1975).  Applying these

23   factors, the Court concludes that the settlement for $14

24   million in cash, plus significant structural changes in the

25   Plan, is fair, reasonable and adequate.

1    A.  Complexity, expense and likely duration.  All

2  defendants have denied wrongdoing and liability.  They

3  vigorously through able counsel, defended the action up to the

4  point of settlement and would no doubt continue to do so,

5  absent a settlement, defending through continued class action

6  and merits discovery, class certification, objections, trial,

7  and, if unsuccessful at trial, on appeal.  This action is

8  complex and raises novel issues in the ERISA context, issues

9  that have not been decided definitively by the Supreme Court

10  and Courts of Appeals.  If successful, plaintiffs' ultimate

11  recovery would be delayed for years during which enormous

12  attorneys' fees and expenses would be incurred.  Settlement

13  ensures prompt payment and enjoyment of the restructured

14  provisions of the Plan.

15    B.  Reaction of the Class to the Settlement.  As noted

16  above, only .016 percent of the more than one hundred fifteen

17  thousand class members submitted objections to the settlement

18  agreement, which reinforces the fairness and adequacy of its

19  provisions.

20    C.  Stage of Proceedings and Discovery.  The extensive

21  investigation of the circumstances of this case was described

22  above.  It is apparent the plaintiffs' counsel had full

23  information relating to the merits of the case and were in a

24  position to negotiate and evaluate the terms of the settlement

25    D.  Risk of Establishing Liability and Damages.

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.   (973) 220-9465

Colloquy                                    34

1   Plaintiffs' counsel who have thoroughly familiarized themselves

2   with the facts of this case and the applicable law have

3   concluded that the terms of the settlement represent an

4   appropriate balance of the amount that might ultimately be

5   recovered if successful and the risks of not recovering at all.

6   There are novel and complex issues, some of which the Court

7   recognised when it addressed defendants' motion to dismiss.

8   ERISA law is in the process of development.  In re Xcel Energy,

9   Inc. Securities, Derivative & ERISA Litigation, 364 F. Supp.

10  2d, 980, (District of Minnesota, 2005).  In re Global Crossing

11  Securities and ERISA litigation, 225 F.R.D., 436, 459 Note 13

12  (Southern District of New York 2004).  Computing damages raises

13  distinct problems.  Unlike securities law claims, ERISA

14  provides relief for the imprudent purchase and holding of stock

15  by a Plan during the class period.  In re Ikon Office

16  Solutions, Inc., 191 F.R.D. 457, 464 (Eastern District of

17  Pennsylvania, 2000), but there is little law explaining the

18  basic principle's application to the type of defined

19  contribution Plan at issue here.  Damages calculations in ERISA

20  cases such as this one require a sophisticated computer model

21  of the Plan involved and require consideration of a number of

22  complex interrelated factors.  The legal and factual

23  complexities and uncertainties of calculating and proving ERISA

24  damages point strongly towards approving the settlement.

25          E.  Risk of Maintaining Class Action Through Trial.

Colloquy                           35

1    There is always a risk that class action status might not be

2    maintained through trial.  If it could not be maintained, the

3    value of the action would decline precipitously.  The Court

4    does not consider this to be a very serious risk and by itself

5    it would not be a compelling reason to approve a settlement.

6           F.   Ability of Defendants to Withstand a Greater

7    Judgment.  Undoubtedly Honeywell could withstand a greater

8    judgment, but the other factors weigh sufficiently in favor of

9    approving the settlement.  The risks entailed in seeking a

10   larger recovery through trial militate against rejecting the

11   opportunity to receive prompt payment of a lesser sum.

12           G.   Reasonableness of the Settlement Fund.  One of the

13   principal grounds of those who filed objections is that the

14   case is being settled for an inadequate amount, specifically

15   that plaintiffs should hold out for more than $14 million in

16   cash and the changes in the Plan that will allow for greater

17   diversification among the participant accounts.  This is "in

18   plaintiffs' counsel's estimation, an outstanding result."

19   Considering the skill and extensive experience of counsel and

20   the vigor with which this case has been pursued, this

21   estimation is entitled to considerable deference.

22           The persons who object to the settlement are well

23   aware of the losses incurred and the hurt that the losses have

24   caused to Plan participants.  They cannot be expected to be

25   aware of the legal uncertainties in computing damages for

Case 3:10-cv-50089   Document 24-17   Filed 08/18/10   Page 37 of 48

1    recovery purposes and of the legal hurdles to be faced to

2    secure any recovery at all.  One objector urged that plaintiffs

3    should have calculated how many additional shares of Honeywell

4    stock the Plan should have been able to purchase if the

5    company's equity was not inflated in the settlement class

6    period and compare that to what the Plan held at the end of

7    that period as an approach to estimating damages.  It is

8    relevant to note that the decline in value of the Honeywell

9    Common Stock Fund was less in each of the three years of the

10   2000 through 2002 bear market than the decline in value of a

11   diversified stock fund that was also an investment option under

12   the Plan.

13          One objector noted that the Plan held about 10 percent

14   of Honeywell's outstanding shares.  Of significance, $14

15   million represents 14 percent of the monetary settlement

16   reached in the related securities case which this Court

17   approved some months ago.  Further, the $14 million represents

18   93 percent of the company's fiduciary liability policy, an

19   obligation which the insurance company originally disclaimed.

20   Although no precise value could be placed upon the negotiated

21   structural relief, the opinion of Professor Ramaswamy

22   establishes that it is substantial, far more than the $14

23   million cash payment.

24          Weighing the various factors, the Court concludes that

25   the settlement is fair, reasonable and adequate.

Colloquy                                        37

1          Six, attorneys' Fees and Expenses.  Plaintiffs'

2    attorneys seek fees in the amount of 25 percent of the total

3    recovery and out-of-pocket expenses of $43,867.09 incurred

4    since this lawsuit began.  Several of the objectors filed

5    objections to the maximum amount of 30 percent that the class

6    Notice advised might be requested, but the Court will assume

7    that the objections would be advanced to the 25 percent

8    request.  One objector contended simply that the case does not

9    require extensive legal work or a complicated determination.

10   Another would limit fees to what real estate brokers typically

11   earn, namely 6 percent.  Others objected on principle to fees

12   being paid to attorneys who appear in class actions.  Some

13   simply objected to 30 percent as being too high a percentage.

14          It is understandable that lay persons cannot

15   appreciate both the amount of work and the risk of receiving no

16   fee that enter into representation in a class action case.  In

17   the present case, the work which the attorneys performed is

18   described above.  In accomplishing this work, the three law

19   firms representing plaintiffs devoted 2223.6 hours of attorney

20   and paralegal time (Schiffrin & Barroway LLP - 2212.6 hours;

21   Brodsky & Smith, LLC - 28.3 hours; Trujillo Rodriguez &

22   Richards, LLC - 82.70 hours).

23          It is universally recognized in the courts that

24   attorneys who generate a fund of recovery for the benefit of a

25   class should be fairly compensated.  Boeing Co. v. Van Gemert

Colloquy                                    38

1   444 U.S. 472, 478 (1980).  Application of a portion of the

2   collected funds to the payment of attorneys' fees spreads the

3   payment proportionately among those who benefited from the

4   suit.  It encourages attorneys to undertake these kinds of

5   difficult cases.

6            The Court of Appeals for the Third Circuit as well as

7   the courts of many other circuits have expressed a preference

8   for awarding attorneys' fees from a common fund pursuant to the

9   percentage of the fund method of calculation.  In re Prudential

10  Insurance Company Am. Sales Practices Litigation Agent Actions,

11  148 F. 3d 288, 333, (3rd Circuit 1998).  This method is an

12  alternative to the lodestar method in which a fee is computed

13  by multiplying the reasonable number of hours the attorneys

14  expended on the case by the rates charged by comparable

15  attorneys in the area in which the services were rendered.  To

16  arrive at the ultimate fee, this lodestar figure is usually

17  multiplied by a factor to reflect the degree of success, the

18  risk of nonpayment the attorneys faced and perhaps the delay in

19  payment that they encountered.  But, as noted, the preference

20  is for computing the award on the basis of a percentage of

21  recovery, perhaps checking the result against a lodestar

22  computation to ensure that it is not grievously out of line.

23           The amount of the percentage varies case to case, 15

24  percent, 20 percent, 25 percent, 30 percent, 33 1/3 percent, 38

25  percent having been awarded.  Thiry percent or 33 1/3 percent

| | Colloquy | 39 |

1   is quite common.  The Court has reviewed the various factors

2   that govern the determination of an appropriate percentage and

3   concludes that the requested 25 percent of the class recovery

4   is reasonable, particularly in light of the fact that the value

5   of the structural changes in the Plan is not included in the

6   amount to which the percentage is applied.  Gunter v. Ridgewood

7   Energy Corporation, 223 F. 3d 195 (3rd Circuit 2000).

8        The proposed settlement appears to be favorable to the

9   class, conferring the immediate benefit of $14 million plus

10  accrued interest less attorneys' fees and expenses and the

11  named plaintiffs case contributions.  In addition, in the

12  future each plan participant who is or has become 100 percent

13  vested in his or her Company Matching Contribution Account

14  shall have the right to direct the investment of his or her

15  Company Matching Contribution Account balance in the same

16  manner and among the same investment alternatives as are

17  available for the investment of employee contributions.

18        As described above, very few members of the class

19  voiced objections to attorneys' fees with an upper limit of 30

20  percent.  Eighteen out of the 115,000 to whom notices were sent

21  filed objections, and not all of the objections were to

22  attorney's fees.  Understandably these few objectors were

23  unaware of the principles that the courts have developed over

24  the years for awarding attorneys' fees.  The Court recognizes

25  that very few class members are likely to analyze the notices

Colloquy                                40

1   which are sent to them.  Despite every effort to make them
2   readily understandable to lay people, they cannot help but be
3   technical in nature, lengthy and complex.  The vast majority of
4   class members rely upon the good faith of the class
5   representatives and their attorneys and upon the oversight role
6   of the Court.  Thus in the case where the class members do not
7   include institutional investors an absence of a large number of
8   objections to the Plan itself and to the requested attorney's
9   fees is of limited significance.  However, in the present case
10  where the few objections filed did not raise substantial
11  grounds to reject the requested attorney's fees, the absence of
12  a significant number of objections and the lack of merit of the
13  few objections that were filed are factors pointing towards
14  approving the fee application.
15       Plaintiffs' counsel undoubtedly possess great skill
16  and experience in this kind of case and have exhibited that
17  experience during the course of these proceedings.
18       Unlike the typical securities fraud case, a field in
19  which the law has well developed during the prior decades,
20  ERISA class actions are a relatively new phenomenon, presenting
21  complex issues as the courts deal with the complicated ERISA
22  statute.  Faced with this statute, counsel had to engage in
23  extensive factual explorations and address legal problems both
24  in the context of seeking class certification and during the
25  course of the motion to dismiss.  In this context both the

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                    41

1    merits and class litigation, and the settlement negotiations

2    were conducted with experienced lawyers and powerful law firms

3    on the opposing side.  The Ramseyer lawsuit was commenced on

4    March 17, 2003, and was consolidated on May 8, 2003.  The

5    consolidated complaint was filed on July 28, 2003.  Intense

6    investigative and litigation activity, described above,

7    proceeded thereafter and continued until October, 2004 when a

8    settlement was agreed upon.  Had the case proceeded to

9    additional class action and merits discovery its duration would

10   have been greater, but one of the objections of the percentage

11   of recovery method of computing attorneys' fees is to encourage

12   early resolution of cases and to bring to an end continued

13   litigation that would generate extensive efforts and increasing

14   attorneys' fees.

15          The risk of not succeeding on the merits (which would

16   result in no recovery by the class members and, of course, no

17   attorneys' fees) was far greater in this case than in a typical

18   securities fraud case.  Apart from the usual difficulties in

19   developing the factual predicates underlying the legal theory

20   on the basis of which recovery is sought, in this, an ERISA

21   case, the legal theories themselves are still subject to

22   challenge.  In particular, the application of long-standing

23   fiduciary principles in the ERISA context has yet to be

24   authoritatively developed.  As the Court stated in In re Global

25   Securities and ERISA Litigation 225 F.R.D 436, 456 (Southern

Colloquy                                                    42

1    District of New York, 2004).

2              "The ERISA cases would pose additional factual and

3    legal issues.  Fiduciary status, the scope of fiduciary

4    responsibility, the appropriate fiduciary response to the

5    Plan's concentration in company stock and defendant's business

6    practice would be issues for proof, and numerous legal issues

7    concerning fiduciary liability in connection with company stock

8    in 401(k) Plan remained unresolved.  These uncertainties would

9    substantially increase the ERISA cases' complexity, duration,

10   and expense - and thus militate in favor of settlement

11   approval."

12             The legal and factual contentions of the class members

13   would be challenged vigorously by defendants' able counsel.

14   The risks inherent in this case support approval of the

15   settlement and approval of the attorneys' fees application.

16             Class counsel have described the work they have

17   performed and the hours expended performing that work -

18   specifically 2223.6 hours - see the foregoing sections of this

19   opinion.  They will have to continue expending time finalizing

20   the settlement, overseeing claims administration and dealing

21   with any appellate issues, should they arise.  Without

22   consideration of the additional legal work that will have to be

23   performed the lodestar in this case is $937,160, and the

24   requested fee represents a multiplier of 3.8.  In fund in court

25   cases multipliers have ranged from 1.7 to 2.66 to 3.15 to 6 and

Colloquy                                                    43

1    even higher.  Prompt resolution of a case is often reflected in

2    a higher multiplier, rewarding prompt recovery for the members

3    of the class and discouraging unnecessary protracted

4    litigation.  If I were to compute the lodestar in this case for

5    the purpose of actually computing the fee, I might have arrived

6    at a somewhat lesser figure, finding that the rates the

7    attorneys project to be somewhat high.  However, I might well

8    apply a somewhat higher multiplier, and the end result would be

9    substantially the same.

10          . Considering all these factors, I find that the

11   attorneys' fees being requested are reasonable and they well be

12   allowed.  No objection has been raised to reimbursement of the

13   attorneys' expenses totaling at least $43,887.09 as of the date

14   of this application.  They appear to have been reasonably

15   incurred and will be allowed.

16          Seven, Named Plaintiffs' Case Contribution Awards.

17   Class counsel seek approval of case contribution awards to the

18   named plaintiffs in the amount of $2500 each.  A few class

19   members objected to the payment of these sums.  However, the

20   persons who agreed to be named as class plaintiffs undertook

21   responsibilities in connection with the litigation.  They had

22   to provide information and subjected themselves to depositions

23   to a greater degree than the other members of the class.

24   Courts frequently allow modest compensation for the role on the

25   occasion of the settlement of a class action.  The modest

Colloquy                                43

1   cases multipliers have ranged from 1.7 to 2.66 to 3.15 to 6 and

2   even higher.  Prompt resolution of a case is often reflected in

3   a higher multiplier, rewarding prompt recovery for the members

4   of the class and discouraging unnecessary protracted

5   litigation.  If I were to compute the lodestar in this case for

6   the purpose of actually computing the fee, I might have arrived

7   at a somewhat lesser figure, finding that the rates the

8   attorneys project to be somewhat high.  However, I might well

9   apply a somewhat higher multiplier, and the end result would be

10  substantially the same.

11        Considering all these factors, I find that the

12  attorneys' fees being requested are reasonable and they will be

13  allowed.  No objection has been raised to reimbursement of the

14  attorneys' expenses totaling at least $43,887.09 as of the date

15  of this application.  They appear to have been reasonably

16  occurred and will be allowed.

17        Seven, Named Plaintiffs' Case Contribution Awards.

18  Class counsel seek approval of case contribution awards to the

19  name plaintiffs in the amount of $2500 each.  A few class

20  members objected to the payment of these sums.  However, the

21  persons who agreed to be named as class plaintiffs undertook

22  responsibilities in connection with the litigation.  They had

23  to provide information and subjected themselves to depositions

24  to a greater degree than the other members of the class.

25  Courts frequently allow modest compensation for the role on the

Colloquy                                    44

1    occasion of the settlement of a class action.  The modest

2    amounts suggested for this purpose are reasonable and will be

3    allowed.

4              Eight, Plan of Allocation.  A ruling on a plan of

5    allocation will be deferred for a brief period.

6              Nine, Conclusion.  For the reasons set forth above, an

7    order will be entered:  One, certifying the class; two,

8    approving the settlement as fair, reasonable and adequate;

9    three, approving class plaintiffs' attorneys' petition for

10   payment of attorneys' fees and reimbursement of expenses; and

11   four, approving the requested payment of a case contribution

12   award for the the named plaintiffs.

13             Now, I have one problem here, what is the amount of

14   the expenses which are being requested for reimbursement?  I

15   have two figures, one would seem rather enormous, four hundred

16   thousand dollars, which I don't think is correct.

17             MR. MELTZER:  No, your Honor.  Forty-three thousand,

18   eight hundred and eighty-seven dollars and nine cents.

19             THE COURT:  All right.  I must have had a typo here.

20   That will be contradicted, and the figure which I now have will

21   be inserted.  Forty-three thousand, eight hundred and

22   eighty-seven dollars and nine cents.

23             MR. MELTZER:  Correct.

24             THE COURT:  All right.  That figure will be

25   substituted for the four hundred odd thousand, which I stated

                                Colloquy                    45

1    previously.

2              THE COURT:  We have orders and what not to be signed.

3              MR. ECCLES:  Your Honor, assuming that the parties

4    reach agreement on the allocation, is it agreeable to file

5    consent orders rather than file a formal motion for approval?

6              THE COURT:  I went over the plan of allocation as

7    submitted, I saw nothing wrong with it.  Does anyone have any

8    comments on the plan, which I assume is a subject of what will

9    be coming next?

10             MR. ECCLES:  I think there are some expenses that were

11   not considered at our end that need to be plugged in there.

12   That's the only --

13             THE COURT:  They seem to be fairly trivial.  Well,

14   maybe not to you.

15             MR. ECCLES:  Well --

16             THE COURT:  Maybe not to you.

17             MR. ECCLES:  It's not going to change drastically.

18             THE COURT:  Do we need a separate hearing?

19             MR. ECCLES:  I don't think we need a separate hearing.

20             THE COURT:  Could we just submit a consent order?

21             MR. ECCLES:  Yes, your Honor.

22             THE COURT:  I'll look at it and see if there's any

23   other changes in my mind.  I doubt that they would, what you

24   hve given me.

25             MS. RODRIGUEZ:  They're the proposed orders, both with

        MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.  (973) 220-9465

Colloquy                                                46

1    regard to the settlement and the attorneys' fees.

2         THE COURT:  All right.  WeLL, let me see what you have

3    here.

4         In the first paragraph, I'm going to add:  For the

5    reasons stated in the bench opinion.  I'm going to add that

6    after duly reached.

7                    (Matter concluded)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MOLLIE ANN GIORDANO, C.S.R., NEWARK, N.J.   (973) 220-9465